*529 Chief Justice Roberts
announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, and III-C, an opinion with respect to Part IV, in which Justice Breyer and Justice Kagan join, and an opinion with respect to Parts III-A, III-B, and III-D.
*530 Today we resolve constitutional challenges to two provisions of the Patient Protection and Affordable Care Act of 2010: the individual mandate, which requires individuals to purchase a health insurance policy providing a minimum *531 level of coverage; and the Medicaid expansion, which gives funds to the States on the condition that they provide specified health care to all citizens whose income falls below a certain threshold. We do not consider whether the Act em *532 bodies sound policies. That judgment is entrusted to the Nation’s elected leaders. We ask only whether Congress has the power under the Constitution to enact the challenged provisions.
*533 In our federal system, the National Government possesses only limited powers; the States and the people retain the remainder. Nearly two centuries ago, Chief Justice Marshall observed that “the question respecting the extent of *534 the powers actually granted” to the Federal Government “is perpetually arising, and will probably continue to arise, as long as our system shall exist.” McCulloch v. Maryland, 4 Wheat. 316, 405 (1819). In this case we must again determine whether the Constitution grants Congress powers it now asserts, but which many States and individuals believe it does not possess. Resolving this controversy requires us to examine both the limits of the Government’s power, and our own limited role in policing those boundaries.
The Federal Government “is acknowledged by all to be one of enumerated powers.” Ibid. That is, rather than granting general authority to perform all the conceivable functions of government, the Constitution lists, or enumerates, the Federal Government’s powers. Congress may, for example, “coin Money,” “establish Post Offices,” and “raise and support Armies.” Art. I, § 8, cls. 5, 7, 12. The enumeration of powers is also a limitation of powers, because “[t]he enumeration presupposes something not enumerated.” Gibbons v. Ogden, 9 Wheat. 1, 195 (1824). The Constitution’s express conferral of some powers makes clear that it does not grant others. And the Federal Government “can exer *535 cise only the powers granted to it.” McCulloch, supra, at 405.
Today, the restrictions on government power foremost in many Americans’ minds are likely to be affirmative prohibitions, such as contained in the Bill of Rights. These affirmative prohibitions come into play, however, only where the Government possesses authority to act in the first place. If no enumerated power authorizes Congress to pass a certain law, that law may not be enacted, even if it would not violate any of the express prohibitions in the Bill of Rights or elsewhere in the Constitution.
Indeed, the Constitution did not initially include a Bill of Rights at least partly because the Framers felt the enumeration of powers sufficed to restrain the Government. As Alexander Hamilton put it, “the Constitution is itself, in every rational sense, and to every useful purpose, A bill op rights.” The Federalist No. 84, p. 515 (C. Rossiter ed. 1961). And when the Bill of Rights was ratified, it made express what the enumeration of powers necessarily implied: “The powers not delegated to the United States by the Constitution . . . are reserved to the States respectively, or to the people.” U. S. Const., Arndt. 10. The Federal Government has expanded dramatically over the past two centuries, but it still must show that a constitutional grant of power authorizes each of its actions. See, e. g., United States v. Comstock, 560 U. S. 126 (2010).
The same does not apply to the States, because the Constitution is not the source of their power. The Constitution may restrict state governments—as it does, for example, by forbidding them to deny any person the equal protection of the laws. But where such prohibitions do not apply, state governments do not need constitutional authorization to act. The States thus can and do perform many of the vital functions of modern government—punishing street crime, running public schools, and zoning property for development, to name but a few—even though the Constitution’s text does *536 not authorize any government to do so. Our cases refer to this general power of governing, possessed by the States but not by the Federal Government, as the “police power.” See, e. g., United States v. Morrison, 529 U. S. 598, 618-619 (2000).
“State sovereignty is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power.” New York v. United States, 505 U. S. 144, 181 (1992) (internal quotation marks omitted). Because the police power is controlled by 50 different States instead of one national sovereign, the facets of governing that touch on citizens’ daily lives are normally administered by smaller governments closer to the governed. The Framers thus ensured that powers which “in the ordinary course of affairs, concern the lives, liberties, and properties of the people” were held by governments more local and more accountable than a distant federal bureaucracy. The Federalist No. 45, at 298 (J. Madison). The independent power of the States also serves as a check on the power of the Federal Government: “By denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power.” Bond v. United States, 564 U. S. 211, 222 (2011).
This case concerns two powers that the Constitution does grant the Federal Government, but which must be read carefully to avoid creating a general federal authority akin to the police power. The Constitution authorizes Congress to “regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes.” Art. I, § 8, cl. 3. Our precedents read that to mean that Congress may regulate “the channels of interstate commerce,” “persons or things in interstate commerce,” and “those activities that substantially affect interstate commerce.” Morrison, supra, at 609 (internal quotation marks omitted). The power over activities that substantially affect interstate commerce can be expansive. That power has been held to *537 authorize federal regulation of such seemingly local matters as a farmer’s decision to grow wheat for himself and his livestock, and a loan shark’s extortionate collections from a neighborhood butcher shop. See Wickard v. Filburn, 317 U. S. 111 (1942); Perez v. United States, 402 U. S. 146 (1971).
Congress may also “lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States.” U. S. Const., Art. I, § 8, cl. 1. Put simply, Congress may tax and spend. This grant gives the Federal Government considerable influence even in areas where it cannot directly regulate. The Federal Government may enact a tax on an activity that it cannot authorize, forbid, or otherwise control. See, e. g., License Tax Cases, 5 Wall. 462, 471 (1867). And in exercising its spending power, Congress may offer funds to the States, and may condition those offers on compliance with specified conditions. See, e.g., College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd., 527 U. S. 666, 686 (1999). These offers may well induce the States to adopt policies that the Federal Government itself could not impose. See, e. g., South Dakota v. Dole, 483 U. S. 203, 205-206 (1987) (conditioning federal highway funds on States raising their drinking age to 21).
The reach of the Federal Government’s enumerated powers is broader still because the Constitution authorizes Congress to “make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers.” Art. I, § 8, cl. 18. We have long read this provision to give Congress great latitude in exercising its powers: “Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.” McCulloch, 4 Wheat., at 421.
Our permissive reading of these powers is explained in part by a general reticence to invalidate the acts of the Na *538 tion’s elected leaders. “Proper respect for a co-ordinate branch of the government” requires that we strike down an Act of Congress only if “the lack of constitutional authority to pass [the] act in question is clearly demonstrated.” United States v. Harris, 106 U. S. 629, 635 (1883). Members of this Court are vested with the authority to interpret the law; we possess neither the expertise nor the prerogative to make policy judgments. Those decisions are entrusted to our Nation’s elected leaders, who can be thrown out of office if the people disagree with them. It is not our job to protect the people from the consequences of their political choices.
Our deference in matters of policy cannot, however, become abdication in matters of law. “The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written.” Marbury v. Madison, 1 Cranch 137, 176 (1803). Our respect for Congress’s policy judgments thus can never extend so far as to disavow restraints on federal power that the Constitution carefully constructed. “The peculiar circumstances of the moment may render a measure more or less wise, but cannot render it more or less constitutional.” Chief Justice John Marshall, A Friend of the Constitution No. V, Alexandria Gazette, July 5, 1819, in John Marshall’s Defense of McCulloch v. Maryland 190-191 (G. Gunther ed. 1969). And there can be no question that it is the responsibility of this Court to enforce the limits on federal power by striking down acts of Congress that transgress those limits. Marbury v. Madison, supra, at 175-176.
The questions before us must be considered against the background of these basic principles.
HH
In 2010, Congress enacted the Patient Protection and Affordable Care Act, 124 Stat. 119. The Act aims to increase the number of Americans covered by health insurance and decrease the cost of health care. The Act’s 10 titles stretch *539 over 900 pages and contain hundreds of provisions. This case concerns constitutional challenges to two key provisions, commonly referred to as the individual mandate and the Medicaid expansion.
The individual mandate requires most Americans to maintain “minimum essential” health insurance coverage. 26 U. S. C. § 5000A. The mandate does not apply to some individuals, such as prisoners and undocumented aliens. § 5000A(d). Many individuals will receive the required coverage through their employer, or from a government program such as Medicaid or Medicare. See §5000A(f). But for individuals who are not exempt and do not receive health insurance through a third party, the means of satisfying the requirement is to purchase insurance from a private company.
Beginning in 2014, those who do not comply with the mandate must make a “[s]hared responsibility payment” to the Federal Government. § 5000A(b)(1). That payment, which the Act describes as a “penalty,” is calculated as a percentage of household income, subject to a floor based on a specified dollar amount and a ceiling based on the average annual premium the individual would have to pay for qualifying private health insurance. §5000A(c). In 2016, for example, the penalty will be 2.5 percent of an individual’s household income, but no less than $695 and no more than the average yearly premium for insurance that covers 60 percent of the cost of 10 specified services (e. g., prescription drugs and hospitalization). Ibid.; 42 U. S. C. § 18022. The Act provides that the penalty will be paid to the Internal Revenue Service with an individual’s taxes, and “shall be assessed and collected in the same manner” as tax penalties, such as the penalty for claiming too large an income tax refund. 26 U. S. C. § 5000A(g)(1). The Act, however, bars the IRS from using several of its normal enforcement tools, such as criminal prosecutions and levies. § 5000A(g)(2). And some individuals who are subject to the mandate are nonetheless exempt *540 from the penalty—for example, those with income below a certain threshold and members of Indian tribes. § 5000A(e).
On the day the President signed the Act into law, Florida and 12 other States filed a complaint in the Federal District Court for the Northern District of Florida. Those plaintiffs—who are both respondents and petitioners here, depending on the issue—were subsequently joined by 18 more States, several individuals, and the National Federation of Independent Business. The plaintiffs alleged, among other things, that the individual mandate provisions of the Act exceeded Congress’s powers under Article I of the Constitution. The District Court agreed, holding that Congress lacked constitutional power to enact the individual mandate. 780 F. Supp. 2d 1256 (ND Fla. 2011). The District Court determined that the individual mandate could not be severed from the remainder of the Act, and therefore struck down the Act in its entirety. Id., at 1305-1306.
The Court of Appeals for the Eleventh Circuit affirmed in part and reversed in part. The court affirmed the District Court’s holding that the individual mandate exceeds Congress’s power. 648 F. 3d 1235 (2011). The panel unanimously agreed that the individual mandate did not impose a tax, and thus could not be authorized by Congress’s power to “lay and collect Taxes.” U. S. Const., Art. I, § 8, cl. 1. A majority also held that the individual mandate was not supported by Congress’s power to “regulate Commerce . . . among the several States.” Id., cl. 3. According to the majority, the Commerce Clause does not empower the Federal Government to order individuals to engage in commerce, and the Government’s efforts to cast the individual mandate in a different light were unpersuasive. Judge Marcus dissented, reasoning that the individual mandate regulates economic activity that has a clear effect on interstate commerce.
Having held the individual mandate to be unconstitutional, the majority examined whether that provision could be severed from the remainder of the Act. The majority deter *541 mined that, contrary to the District Court’s view, it could. The court thus struck down only the individual mandate, leaving the Act’s other provisions intact. 648 F. 3d, at 1328.
Other Courts of Appeals have also heard challenges to the individual mandate. The Sixth Circuit and the D. C. Circuit upheld the mandate as a valid exercise of Congress’s commerce power. See Thomas More Law Center v. Obama, 651 F. 3d 529 (CA6 2011); Seven-Sky v. Holder, 661 F. 3d 1 (CADC 2011). The Fourth Circuit determined that the Anti-Injunction Act prevents courts from considering the merits of that question. See Liberty Univ., Inc. v. Geithner, 671 F. 3d 391 (2011). That statute bars suits “for the purpose of restraining the assessment or collection of any tax.” 26 U. S. C. § 7421(a). A majority of the Fourth Circuit panel reasoned that the individual mandate’s penalty is a tax within the meaning of the Anti-Injunction Act, because it is a financial assessment collected by the IRS through the normal means of taxation. The majority therefore determined that the plaintiffs could not challenge the individual mandate until after they paid the penalty.[1]
The second provision of the Affordable Care Act directly challenged here is the Medicaid expansion. Enacted in 1965, Medicaid offers federal funding to States to assist pregnant women, children, needy families, the blind, the elderly, and the disabled in obtaining medical care. See 42 U. S. C. § 1396a(a)(10). In order to receive that funding, States must comply with federal criteria governing matters such as who *542 receives care and what services are provided at what cost. By 1982 every State had chosen to participate in Medicaid. Federal funds received through the Medicaid program have become a substantial part of state budgets, now constituting over 10 percent of most States’ total revenue.
The Affordable Care Act expands the scope of the Medicaid program and increases the number of individuals the States must cover. For example, the Act requires state programs to provide Medicaid coverage to adults with incomes up to 133 percent of the federal poverty level, whereas many States now cover adults with children only if their income is considerably lower, and do not cover childless adults at all. See § 1396a(a)(10)(A)(i)(VIII). The Act increases federal funding to cover the States’ costs in expanding Medicaid coverage, although States will bear a portion of the costs on their own. § 1396d(y)(1). If a State does not comply with the Act’s new coverage requirements, it may lose not only the federal funding for those requirements, but all of its federal Medicaid funds. See § 1396c.
Along with their challenge to the individual mandate, the state plaintiffs in the Eleventh Circuit argued that the Medicaid expansion exceeds Congress’s constitutional powers. The Court of Appeals unanimously held that the Medicaid expansion is a valid exercise of Congress’s power under the Spending Clause. U. S. Const., Art. I, § 8, cl. 1. And the court rejected the States’ claim that the threatened loss of all federal Medicaid funding violates the Tenth Amendment by coercing them into complying with the Medicaid expansion. 648 F. 3d, at 1264, 1268.
We granted certiorari to review the judgment of the Court of Appeals for the Eleventh Circuit with respect to both the individual mandate and the Medicaid expansion. 565 U. S. 1033-1034 (2011). Because no party supports the Eleventh Circuit’s holding that the individual mandate can be completely severed from the remainder of the Affordable Care Act, we appointed an amicus curiae to defend that aspect of the judgment below. And because there is a reason *543 able argument that the Anti-Injunction Act deprives us of jurisdiction to hear challenges to the.individual mandate, but no party supports that proposition, we appointed an amicus curiae to advance it.[2]
I—( )—I
Before turmng to the merits, we need to be sure we have the authority to do so. The Anti-Injunction Act provides that “no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed.” 26 U. S. C. § 7421(a). This statute protects the Government’s ability to collect a consistent stream of revenue, by barring litigation to enjoin or otherwise obstruct the collection of taxes. Because of the Anti-Injunction Act, taxes can ordinarily be challenged only after they are paid, by suing for a refund. See Enochs v. Williams Packing & Nav. Co., 370 U. S. 1, 7-8 (1962).
The penalty for not complying with the Affordable Care Act’s individual mandate first becomes enforceable in 2014. The present challenge to the mandate thus seeks to restrain the penalty’s future collection. Amicus contends that the Internal Revenue Code treats the penalty as a tax, and that the Anti-Injunction Act therefore bars this suit.
The text of the pertinent statutes suggests otherwise. The Anti-Injunction Act applies to suits “for the purpose of restraining the assessment or collection of any tax.” § 7421(a) (emphasis added). Congress, however, chose to describe the “[sjhared responsibility payment” imposed on those who forgo health insurance not as a “tax,” but as a “penalty.” §§5000A(b), (g)(2). There is no immediate reason to think that a statute applying to “any tax” would apply to a “penalty.”
*544 Congress’s decision to label this exaction a “penalty” rather than a “tax” is significant because the Affordable Care Act describes many other exactions it creates as “taxes.” See Thomas More, 651 F. 3d, at 551. Where Congress uses certain language in one part of a statute and different language in another, it is generally presumed that Congress acts intentionally. See Russello v. United States, 464 U. S. 16, 23 (1983).
Amicus argues that even though Congress did not label the shared responsibility payment a tax, we should treat it as such under the Anti-Injunction Act because it functions like a tax. It is true that Congress cannot change whether an exaction is a tax or a penalty for constitutional purposes simply by describing it as one or the other. Congress may not, for example, expand its power under the Taxing Clause, or escape the Double Jeopardy Clause’s constraint on criminal sanctions, by labeling a severe financial punishment a “tax.” See Child Labor Tax Case (Bailey v. Drexel Furniture Co.), 259 U. S. 20, 36-37 (1922); Department of Revenue of Mont. v. Kurth Ranch, 511 U. S. 767, 779 (1994).
The Anti-Injunction Act and the Affordable Care Act, however, are creatures of Congress’s own creation. How they relate to each other is up to Congress, and the best evidence of Congress’s intent is the statutory text. We have thus applied the Anti-Injunction Act to statutorily described “taxes” even where that label was inaccurate. See Bailey v. George, 259 U. S. 16 (1922) (Anti-Injunction Act applies to “Child Labor Tax” struck down as exceeding Congress’s taxing power in Drexel Furniture).
Congress can, of course, describe something as a penalty but direct that it nonetheless be treated as a tax for purposes of the Anti-Injunction Act. For example, 26 U. S. C. § 6671(a) provides that “any reference in this title to ‘tax’ imposed by this title shall be deemed also to refer to the penalties and liabilities provided by” Subchapter 68B of the Internal Revenue Code. Penalties in Subchapter 68B are thus treated as taxes under Title 26, which includes the Anti- *545 Injunction Act. The individual mandate, however, is not in Subchapter 68B of the Code. Nor does any other provision state that references to taxes in Title 26 shall also be “deemed” to apply to the individual mandate.
Amicus attempts to show that Congress did render the Anti-Injunction Act applicable to the individual mandate, albeit by a more circuitous route. Section 5000A(g)(l) specifies that the penalty for not complying with the mandate “shall be assessed and collected in the same manner as an assessable penalty under subchapter B of chapter 68.” Assessable penalties in Subchapter 68B, in turn, “shall be assessed and collected in the same manner as taxes.” § 6671(a). According to amicus, by directing that the penalty be “assessed and collected in the same manner as taxes,” §5000A(g)(l) made the Anti-Injunction Act applicable to this penalty.
The Government disagrees. It argues that §5000A(g)(1) does not direct courts to apply the Anti-Injunction Act, because § 5000A(g) is a directive only to the Secretary of the Treasury to use the same “‘methodology and procedures’” to collect the penalty that he uses to collect taxes. Brief for United States 32-33 (quoting Seven-Sky, 661 F. 3d, at 11).
We think the Government has the better reading. As it observes, “Assessment” and “Collection” are chapters of the Internal Revenue Code providing the Secretary authority to assess and collect taxes, and generally specifying the means by which he shall do so. See § 6201 (assessment authority); § 6301 (collection authority). Section 5000A(g)(1)’s command that the penalty be “assessed and collected in the same manner” as taxes is best read as referring to those chapters and giving the Secretary the same authority and guidance with respect to the penalty. That interpretation is consistent with the remainder of §5000A(g), which instructs the Secretary on the tools he may use to collect the penalty. See § 5000A(g)(2)(A) (barring criminal prosecutions); § 5000A(g)(2)(B) (prohibiting the Secretary from using notices of lien and levies). The Anti-Injunction Act, by con *546 trast, says nothing about the procedures to be used in assessing and collecting taxes.
Amicus argues in the alternative that a different section of the Internal Revenue Code requires courts to treat the penalty as a tax under the Anti-Injunction Act. Section 6201(a) authorizes the Secretary to make "assessments of all taxes (including interest, additional amounts, additions to the tax, and assessable penalties).” (Emphasis added.) Amicus contends that the penalty must be a tax, because it is an assessable penalty and § 6201(a) says that taxes include assessable penalties.
That argument has force only if § 6201(a) is read in isolation. The Code contains many provisions treating taxes and assessable penalties as distinct terms. See, e. g., §§ 860(h)(1), 6324A(a), 6601(e)(1)-(2), 6602, 7122(b). There would, for example, be no need for § 6671(a) to deem “tax” to refer to certain assessable penalties if the Code already included all such penalties in the term “tax.” Indeed, ami-cus’s earlier observation that the Code requires assessable penalties to be assessed and collected “in the same manner as taxes” makes little sense if assessable penalties are themselves taxes. In light of the Code’s consistent distinction between the terms “tax” and “assessable penalty,” we must accept the Government’s interpretation: Section 6201(a) instructs the Secretary that his authority to assess taxes includes the authority to assess penalties, but it does not equate assessable penalties to taxes for other purposes.
The Affordable Care Act does not require that the penalty for failing to comply with the individual mandate be treated as a tax for purposes of the Anti-Injunction Act. The Anti-Injunction Act therefore does not apply to this suit, and we may proceed to the merits.
III
The Government advances two theories for the proposition that Congress had constitutional authority to enact the indi *547 vidual mandate. First, the Government argues that Congress had the power to enact the mandate under the Commerce Clause. Under that theory, Congress may order individuals to buy health insurance because the failure to do so affects interstate commerce, and could undercut the Affordable Care Act’s other reforms. Second, the Government argues that if the commerce power does not support the mandate, we should nonetheless uphold it as an exercise of Congress’s power to tax. According to the Government, even if Congress lacks the power to direct individuals to buy insurance, the only effect of the individual mandate is to raise taxes on those who do not do so, and thus the law may be upheld as a tax.
A
The Government’s first argument is that the individual mandate is a valid exercise of Congress’s power under the Commerce Clause and the Necessary and Proper Clause. According to the Government, the health care market is characterized by a significant cost-shifting problem. Everyone will eventually need health care at a time and to an extent they cannot predict, but if they do not have insurance, they often will not be able to pay for it. Because state and federal laws nonetheless require hospitals to provide a certain degree of care to individuals without regard to their ability to pay, see, e. g., 42 U. S. C. § 1395dd; Fla. Stat. §395.1041 (2010), hospitals end up receiving compensation for only a portion of the services they provide. To recoup the losses, hospitals pass on the cost to insurers through higher rates, and insurers, in turn, pass on the cost to policy holders in the form of higher premiums. Congress estimated that the cost of uncompensated care raises family health insurance premiums, on average, by over $1,000 per year. 42 U. S. C. § 18091(2)(F).
In the Affordable Care Act, Congress addressed the problem of those who cannot obtain insurance coverage because of pre-existing conditions or other health issues. It did *548 so through the Act's “guaranteed-issue” and “community-rating” provisions. These provisions together prohibit insurance companies from denying coverage to those with such conditions or charging unhealthy individuals higher premiums than healthy individuals. See §§300gg, 300gg-1, 300gg-3, 300gg-4.
The guaranteed-issue and community-rating reforms do not, however, address the issue of healthy individuals who choose not to purchase insurance to cover potential health care needs. In fact, the reforms sharply exacerbate that problem, by providing an incentive for individuals to delay purchasing health insurance until they become sick, relying on the promise of guaranteed and affordable coverage. The reforms also threaten to impose massive new costs on insurers, who are required to accept unhealthy individuals but prohibited from charging them rates necessary to pay for their coverage. This will lead insurers to significantly increase premiums on everyone. See Brief for America's Health Insurance Plans et al. as Amici Curiae in No. 11-393 etc. 8-9.
The individual mandate was Congress’s solution to these problems. By requiring that individuals purchase health insurance, the mandate prevents cost shifting by those who would otherwise go without it. In addition, the mandate forces into the insurance risk pool more healthy individuals, whose premiums on average will be higher than their health care expenses. This allows insurers to subsidize the costs of covering the unhealthy individuals the reforms require them to accept. The Government claims that Congress has power under the Commerce and Necessary and Proper Clauses to enact this solution.
1
The Government contends that the individual mandate is within Congress’s power because the failure to purchase insurance “has a substantial and deleterious effect on inter *549 state commerce” by creating the cost-shifting problem. Brief for United States 34. The path of our Commerce Clause decisions has not always run smooth, see United States v. Lopez, 514 U. S. 549, 552-559 (1995), but it is now well established that Congress has broad authority under the Clause. We have recognized, for example, that “[t]he power of Congress over interstate commerce is not confined to the regulation of commerce among the states,” but extends to activities that “have a substantial effect on interstate commerce.” United States v. Darby, 312 U. S. 100, 118-119 (1941). Congress’s power, moreover, is not limited to regulation of an activity that by itself substantially affects interstate commerce, but also extends to activities that do so only when aggregated with similar activities of others. See Wickard, 317 U. S., at 127-128.
Given its expansive scope, it is no surprise that Congress has employed the commerce power in a wide variety of ways to address the pressing needs of the time. But Congress has never attempted to rely on that power to compel individuals not engaged in commerce to purchase an unwanted product.[3] Legislative novelty is not necessarily fatal; there is a first time for everything. But sometimes “the most telling indication of [a] severe constitutional problem ... is the lack of historical precedent” for Congress’s action. Free Enterprise Fund v. Public Company Accounting Oversight Bd., 561 U. S. 477, 505 (2010) (internal quotation marks omit *550 ted). At the very least, we should “pause to consider the implications of the Government’s arguments” when confronted with such new conceptions of federal power. Lopez, supra, at 564.
The Constitution grants Congress the power to “regulate Commerce.” Art. I, § 8, cl. 3 (emphasis added). The power to regulate commerce presupposes the existence of commercial activity to be regulated. If the power to “regulate” something included the power to create it, many of the provisions in the Constitution would be superfluous. For example, the Constitution gives Congress the power to “coin Money,” in addition to the power to “regulate the Value thereof.” Id., cl. 5. And it gives Congress the power to “raise and support Armies” and to “provide and maintain a Navy,” in addition to the power to “make Rules for the Government and Regulation of the land and naval Forces.” Id., cls. 12-14. If the power to regulate the Armed Forces or the value of money included the power to bring the subject of the regulation into existence, the specific grant of such powers would have been unnecessary. The language of the Constitution reflects the natural understanding that the power to regulate assumes there is already something to be regulated. See Gibbons, 9 Wheat., at 188 (“[T]he enlightened patriots who framed our constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said”).[4]
*551 Our precedent also reflects this understanding. As expansive as our cases construing the scope of the commerce power have been, they all have one thing in common: They uniformly describe the power as reaching “activity.” It is nearly impossible to avoid the word when quoting them. See, e. g., Lopez, supra, at 560 ("Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained”); Perez, 402 U. S., at 154 (“Where the class of activities is regulated and that class is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class” (emphasis in original; internal quotation marks omitted)); Wickard, supra, at 125 (“[E]ven if appellee’s activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce”); NLRB v. Jones & Laughlin Steel Corp., 301 U. S. 1, 37 (1937) (“Although activities may be intrastate in character when separately considered, if they have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions, Congress cannot be denied the power to exercise that control”); see also post, at 602, 611-613, 614-615, 618 (Ginsburg, J., concurring in part, concurring in judgment in part, and dissenting in part).[5]
*552 The individual mandate, however, does not regulate existing commercial activity. It instead compels individuals to become active in commerce by purchasing a product, on the ground that their failure to do so affects interstate commerce. Construing the Commerce Clause to permit Congress to regulate individuals precisely because they are doing nothing would open a new and potentially vast domain to congressional authority. Every day individuals do not do an infinite number of things. In some cases they decide not to do something; in others they simply fail to do it. Allowing Congress to justify federal regulation by pointing to the effect of inaction on commerce would bring countless decisions an individual could potentially make within the scope of federal regulation, and—under the Government’s theory— empower Congress to make those decisions for him.
Applying the Government’s logic to the familiar case of Wickard v. Filburn shows how far that logic would carry us from the notion of a government of limited powers. In Wickard, the Court famously upheld a federal penalty imposed on a farmer for growing wheat for consumption on his own farm. 317 U. S., at 114-115, 128-129. That amount of wheat caused the farmer to exceed his quota under a program designed to support the price of wheat by limiting supply. The Court rejected the farmer’s argument that growing wheat for home consumption was beyond the reach of the commerce power. It did so on the ground that the farmer’s decision to grow wheat for his own use allowed him to avoid purchasing wheat in the market. That decision, when considered in the aggregate along with similar decisions of others, would have had a substantial effect on the interstate market for wheat. Id., at 127-129.
Wickard has long been regarded as “perhaps the most far reaching example of Commerce Clause authority over intrastate activity,” Lopez, 514 U. S., at 560, but the Government’s theory in this case would go much further. Under Wickard it is within Congress’s power to regulate the market for *553 wheat by supporting its price. But price can be supported by increasing demand as well as by decreasing supply. The aggregated decisions of some consumers not to purchase wheat have a substantial effect on the price of wheat, just as decisions not to purchase Health insurance have on the price of insurance. Congress can therefore command that those not buying wheat do so, just as it argues here that it may command that those not buying health insurance do so. The farmer in Wickard was at least actively engaged in the production of wheat, and the Government could regulate that activity because of its effect on commerce. The Government’s theory here would effectively override that limitation, by establishing that individuals may be regulated under the Commerce Clause whenever enough of them are not doing something the Government would have them do.
Indeed, the Government’s logic would justify a mandatory purchase to solve almost any problem. See Seven-Sky, 661 F. 3d, at 14-15 (noting the Government’s inability to “identify any mandate to purchase a product or service in interstate commerce that would be unconstitutional” under its theory of the commerce power). To consider a different example in the health care market, many Americans do not eat a balanced diet. That group makes up a larger percentage of the total population than those without health insurance. See, e. g., Dept. of Agriculture and Dept. of Health and Human Services, Dietary Guidelines for Americans 1 (2010). The failure of that group to have a healthy diet increases health care costs, to a greater extent than the failure of the uninsured to purchase insurance. See, e.g., Finkelstein, Trog-don, Cohen, & Dietz, Annual Medical Spending Attributable to Obesity: Payer- and Service-Specific Estimates, 28 Health Affairs w822 (2009) (detailing the “undeniable link between rising rates of obesity and rising medical spending,” and estimating that “the annual medical burden of obesity has risen to almost 10 percent of all medical spending and could amount to $147 billion per year in 2008”). Those increased *554 costs are borne in part by other Americans who must pay more, just as the uninsured shift costs to the insured. See Center for Applied Ethics, Voluntary Health Risks: Who Should Pay? 6 Issues in Ethics 6 (1993) (noting “overwhelming evidence that individuals with unhealthy habits pay only a fraction of the costs associated with their behaviors; most of the expense is borne by the rest of society in the form of higher insurance premiums, government expenditures for health care, and disability benefits”). Congress addressed the insurance problem by ordering everyone to buy insurance. Under the Government’s theory, Congress could address the diet problem by ordering everyone to buy vegetables. See Dietary Guidelines, swpra, at 19 (“Improved nutrition, appropriate eating behaviors, and increased physical activity have tremendous potential to . . . reduce health care costs”).
People, for reasons of their own, often fail to do things that would be good for them or good for society. Those failures—joined with the similar failures of others—can readily have a substantial effect on interstate commerce. Under the Government’s logic, that authorizes Congress to use its commerce power to compel citizens to act as the Government would have them act.
That is not the country the Framers of our Constitution envisioned. James Madison explained that the Commerce Clause was “an addition which few oppose and from which no apprehensions are entertained.” The Federalist No. 45, at 293. While Congress’s authority under the Commerce Clause has of course expanded with the growth of the national economy, our cases have “always recognized that the power to regulate commerce, though broad indeed, has limits.” Maryland v. Wirtz, 392 U. S. 183, 196 (1968). The Government’s theory would erode those limits, permitting Congress to reaeh beyond the natural extent of its authority, “everywhere extending the sphere of its activity and drawing all power into its impetuous vortex.” The Federalist *555 No. 48, at 309 (J. Madison). Congress already enjoys vast power to regulate much of what we do. Accepting the Government’s theory would give Congress the same license to regulate what we do not do, fundamentally changing the relation between the citizen and the Federal Government.[6]
To an economist, perhaps, there is no difference between activity and inactivity; both have measurable economic effects on commerce. But the distinction between doing something and doing nothing would not have been lost on the Framers, who were “practical statesmen,” not metaphysical philosophers. Industrial Union Dept., AFL-CIO v. American Petroleum Institute, 448 U. S. 607, 673 (1980) (Rehnquist, J., concurring in judgment). As we have explained, “the framers of the Constitution were not mere visionaries, toying with speculations or theories, but practical men, dealing with the facts of political life as they understood them, putting into form the government they were creating, and prescribing in language clear and intelligible the powers that government was to take.” South Carolina v. United States, 199 U. S. 437, 449 (1905). The Framers gave Congress the power to regulate commerce, not to compel it, and for over 200 years both our decisions and Congress’s actions have reflected this understanding. There is no reason to depart from that understanding now.
The Government sees things differently. It argues that because sickness and injury are unpredictable but unavoidable, “the uninsured as a class are active in the market for health care, which they regularly seek and obtain.” Brief *556 for United States 50. The individual mandate “merely regulates how individuals finance and pay for that active participation—requiring that they do so through insurance, rather than through attempted self-insurance with the back-stop of shifting costs to others.” Ibid.
The Government repeats the phrase “active in the market for health care” throughout its brief, see id., at 7, 18, 34, 50, but that concept has no constitutional significance. An individual who bought a car two years ago and may buy another in the future is not “active in the car market” in any pertinent sense. The phrase “active in the market” cannot obscure the fact that most of those regulated by the individual mandate are not currently engaged in any commercial activity involving health care, and that fact is fatal to the Government’s effort to “regulate the uninsured as a class.” Id., at 42. Our precedents recognize Congress’s power to regulate “classfes] of activities,” Gonzales v. Raich, 545 U. S. 1, 17 (2005) (emphasis added), not classes of individuals, apart from any activity in which they are engaged, see, e. g., Perez, 402 U. S., at 153 (“Petitioner is clearly a member of the class which engages in ‘extortionate credit transactions’ ...” (emphasis deleted)).
The individual mandate’s regulation of the uninsured as a class is, in fact, particularly divorced from any link to existing commercial activity. The mandate primarily affects healthy, often young adults who are less likely to need significant health care and have other priorities for spending their money. It is precisely because these individuals, as an actuarial class, incur relatively low health care costs that the mandate helps counter the effect of forcing insurance companies to cover others who impose greater costs than their premiums are allowed to reflect. See 42 U. S. C. § 18091(2)(I) (recognizing that the mandate would “broaden the health insurance risk pool to include healthy individuals, which will lower health insurance premiums”). If the individual mandate is targeted at a class, it is a class whose commercial inactivity rather than activity is its defining feature.
*557 The Government, however, claims that this does not matter. The Government regards it as sufficient to trigger Congress’s authority that almost all those who are uninsured will, at some unknown point in the future, engage in a health care transaction. Asserting that “[t]here is no temporal limitation in the Commerce Clause,” the Government argues that because “[e]veryone subject to this regulation is in or will be in the health care market,” they can be “regulated in advance.” Tr. of Oral Arg. 111 (Mar. 27, 2012).
The proposition that Congress may dictate the conduct of an individual today because of prophesied future activity finds no support in our precedent. We have said that Congress can anticipate the effects on commerce of an economic activity. See, e. g., Consolidated Edison Co. v. NLRB, 305 U. S. 197 (1938) (regulating the labor practices of utility companies); Heart of Atlanta Motel, Inc. v. United States, 379 U. S. 241 (1964) (prohibiting discrimination by hotel operators); Katzenbach v. McClung, 379 U. S. 294 (1964) (prohibiting discrimination by restaurant owners). But we have never permitted Congress to anticipate that activity itself in order to regulate individuals not currently engaged in commerce. Each one of our cases, including those cited by Justice Ginsburg, post, at 606-607, involved preexisting economic activity. See, e. g., Wickard, 317 U. S., at 127-129 (producing wheat); Raich, supra, at 25 (growing marijuana).
Everyone will likely participate in the markets for food, clothing, transportation, shelter, or energy; that does not authorize Congress to direct them to purchase particular products in those or other markets today. The Commerce Clause is not a general license to regulate an individual from cradle to grave, simply because he will predictably engage in particular transactions. Any police power to regulate individuals as such, as opposed to their activities, remains vested in the States.
The Government argues that the individual mandate can be sustained as a sort of exception to this rule, because *558 health insurance is a unique product. According to the Government, upholding the individual mandate would not justify mandatory purchases of items such as cars or broccoli because, as the Government puts it, “[hjealth insurance is not purchased for its own sake like a car or broccoli; it is a means of financing health-care consumption and covering universal risks.” Reply Brief for United States 19. But cars and broccoli are no more purchased for their “own sake” than health insurance. They are purchased to cover the need for transportation and food.
The Government says that health insurance and health care financing are “inherently integrated.” Brief for United States 41. But that does not mean the compelled purchase of the first is properly regarded as a regulation of the second. No matter how “inherently integrated” health insurance and health care consumption may be, they are not the same thing: They involve different transactions, entered into at different times, with different providers. And for most of those targeted by the mandate, significant health care needs will be years, or even decades, away. The proximity and degree of connection between the mandate and the subsequent commercial activity is too lacking to justify an exception of the sort urged by the Government. The individual mandate forces individuals into commerce precisely because they elected to refrain from commercial activity. Such a law cannot be sustained under a clause authorizing Congress to “regulate Commerce.”
2
The Government next contends that Congress has the power under the Necessary and Proper Clause to enact the individual mandate because the mandate is an “integral part of a comprehensive scheme of economic regulation”—the guaranteed-issue and community-rating insurance reforms. Brief for United States 24. Under this argument, it is not necessary to consider the effect that an individual’s inactivity may have on interstate commerce; it is enough that Congress *559 regulate commercial activity in a way that requires regulation of inactivity to be effective.
The power to “make all Laws which shall be necessary and proper for carrying into Execution” the powers enumerated in the Constitution, Art. I, § 8, cl. 18, vests Congress with authority to enact provisions “incidental to the [enumerated] power, and conducive to its beneficial exercise,” McCulloch, 4 Wheat., at 418. Although the Clause gives Congress authority to “legislate on that vast mass of incidental powers which must be involved in the constitution,” it does not license the exercise of any “great substantive and independent powerfe]” beyond those specifically enumerated. Id., at 411, 421. Instead, the Clause is “ ‘merely a declaration, for the removal of all uncertainty, that the means of carrying into execution those [powers] otherwise granted are included in the grant.’ ” Kinsella v. United States ex rel. Singleton, 361 U. S. 234, 247 (1960) (quoting VI Writings of James Madison 383 (G. Hunt ed. 1906)).
As oür jurisprudence under the Necessary and Proper Clause has developed, we have been very deferential to Congress’s determination that a regulation is “necessary.” We have thus upheld laws that are “‘convenient, or useful’ or ‘conducive’ to the authority’s ‘beneficial exercise.’” Comstock, 560 U. S., at 133-134 (quoting McCulloch, supra, at 413, 418). But we have also carried out our responsibility to declare unconstitutional those laws that undermine the structure of government established by the Constitution. Such laws, which are not “consistent] with the letter and spirit of the constitution,” McCulloch, supra, at 421, are not “proper [means] for carrying into Execution” Congress’s enumerated powers. Rather, they are, “in the words of The Federalist, ‘merely acts of usurpation’ which ‘deserve to be treated as such.’” Printz v. United States, 521 U. S. 898, 924 (1997) (quoting The Federalist No. 33, at 204 (A. Hamilton); alteration omitted); see also New York, 505 U. S., at 177; Comstock, supra, at 153 (Kennedy, J., concurring in judg *560 ment) (“It is of fundamental importance to consider whether essential attributes of state sovereignty are compromised by the assertion of federal power under the Necessary and Proper Clause ...”).
Applying these principles, the individual mandate cannot be sustained under the Necessary and Proper Clause as an essential component of the insurance reforms. Each of our prior cases upholding laws under that Clause involved exercises of authority derivative of, and in service to, a granted power. For example, we have upheld provisions permitting continued confinement of those already in federal custody when they could not be safely released, Comstock, supra, at 129; criminalizing bribes involving organizations receiving federal funds, Sabri v. United States, 541 U. S. 600, 602, 605 (2004); and tolling state statutes of limitations while cases are pending in federal court, Jinks v. Richland County, 538 U. S. 456, 459, 462 (2003). The individual mandate, by contrast, vests Congress with the extraordinary ability to create the necessary predicate to the exercise of an enumerated power.
This is in no way an authority that is “narrow in scope,” Comstock, supra, at 148, or “incidental” to the exercise of the commerce power, McCulloch, supra, at 418. Rather, such a conception of the Necessary and Proper Clause would work a substantial expansion of federal authority. No longer would Congress be limited to regulating under the Commerce Clause those who by some pre-existing activity bring themselves within the sphere of federal regulation. Instead, Congress could reach beyond the natural limit of its authority and draw within its regulatory scope those who otherwise would be outside of it. Even if the individual mandate is “necessary” to the Act’s insurance reforms, such an expansion of federal power is not a “proper” means for making those reforms effective.
The Government relies primarily on our decision in Gonzales v. Raich. In Raich, we considered “comprehensive legis *561 lation to regulate the interstate market” in marijuana. 545 U. S., at 22. Certain individuals sought an exemption from that regulation on the ground that they engaged in only intrastate possession and consumption. We denied any exemption, on the ground that; marijuana is a fungible commodity, so that any marijuana could be readily diverted into the interstate market. Congress’s attempt to regulate the interstate market for marijuana would therefore have been substantially undercut if it could not also regulate intrastate possession and consumption. Id., at 19. Accordingly, we recognized that “Congress was acting well within its authority” under the Necessary and Proper Clause even though its “regulation ensnare[d] some purely intrastate activity.” Id., at 22; see also Perez, 402 U. S., at 154. Raich thus did not involve the exercise of any “great substantive and independent power,” McCulloch, supra, at 411, of the sort at issue here. Instead, it concerned only the constitutionality of “individual applications of a concededly valid statutory scheme.” Raich, supra, at 23 (emphasis added).
Just as the individual mandate cannot be sustained as a law regulating the substantial effects of the failure to purchase health insurance, neither can it be upheld as a “necessary and proper” component of the insurance reforms. The commerce power thus does not authorize the mandate. Accord, post, at 649-660 (joint opinion of Scalia, Kennedy, Thomas, and Alito, JJ., dissenting).
B
That is not the end of the matter. Because the Commerce Clause does not support the individual mandate, it is necessary to turn to the Government’s second argument: that the mandate may be upheld as within Congress’s enumerated power to “lay and collect Taxes.” Art. I, § 8, cl. 1.
The Government’s tax power argument asks us to view the statute differently than we did in considering its commerce power theory. In making its Commerce Clause argu *562 ment, the Government defended the mandate as a regulation requiring individuals to purchase health insurance. The Government does not claim that the taxing power allows Congress to issue such a command. Instead, the Government asks us to read the mandate not as ordering individuals to buy insurance, but rather as imposing a tax on those who do not buy that product.
The text of a statute can sometimes have more than one possible meaning. To take a familiar example, a law that reads “no vehicles in the park” might, or might not, ban bicycles in the park. And it is well established that if a statute has two possible meanings, one of which violates the Constitution, courts should adopt the meaning that does not do so. Justice Story said that 180 years ago: “No court ought, unless the terms of an act rendered it unavoidable, to give a construction to it which should involve a violation, however unintentional, of the constitution.” Parsons v. Bedford, 3 Pet. 433, 448-449 (1830). Justice Holmes made the same point a century later: “[T]he rule is settled that as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the Act.” Blodgett v. Holden, 275 U. S. 142, 148 (1927) (concurring opinion).
The most straightforward reading of the mandate is that it commands individuals to purchase insurance. After all, it states that individuals “shall” maintain health insurance. 26 U. S. C. § 5000A(a). Congress thought it could enact such a command under the Commerce Clause, and the Government primarily defended the law on that basis. But, for the reasons explained above, the Commerce Clause does not give Congress that power. Under our precedent, it is therefore necessary to ask whether the Government’s alternative reading of the statute—that it only imposes a tax on those without insurance—is a reasonable one.
Under the mandate, if an individual does not maintain health insurance, the only consequence is that he must make *563 an additional payment to the IRS when he pays his taxes. See § 5000A(b). That, according to the Government, means the mandate can be regarded as establishing a condition— not owning health insurance—that triggers a tax—the required payment to the IRS. Under that theory, the mandate is not a legal command to buy insurance. Rather, it makes going without insurance just another thing the Government taxes, like buying gasoline or earning income. And if the mandate is in effect just a tax hike on certain taxpayers who do not have health insurance, it may be within Congress’s constitutional power to tax.
The question is not whether that is the most natural interpretation of the mandate, but only whether it is a “fairly possible” one. Crowell v. Benson, 285 U. S. 22, 62 (1932). As we have explained, “every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.” Hooper v. California, 155 U. S. 648, 657 (1895). The Government asks us to interpret the mandate as imposing a tax, if it would otherwise violate the Constitution. Granting the Act the full measure of deference owed to federal statutes, it can be so read, for the reasons set forth below.
C
The exaction the Affordable Care Act imposes on those without health insurance looks like a tax in many respects. The “[sjhared responsibility payment,” as the statute entitles it, is paid into the Treasury by “taxpayer^] ” when they file their tax returns. 26 U. S. C. § 5000A(b). It does not apply to individuals who do not pay federal income taxes because their household income is less than the filing threshold in the Internal Revenue Code. § 5000A(e)(2). For taxpayers who do owe the payment, its amount is determined by such familiar factors as taxable income, number of dependents, and joint filing status. §§5000A(b)(3), (c)(2), (c)(4). The requirement to pay is found in the Internal Revenue Code and enforced by the IRS, which—as we previously explained— *564 must assess and collect it “in the same manner as taxes.” Supra, at 545-546. This process yields the essential feature of any tax: It produces at least some revenue for the Government. United States v. Kahriger, 345 U. S. 22, 28, n. 4 (1953). Indeed, the payment is expected to raise about $4 billion per year by 2017. Congressional Budget Office, Payments of Penalties for Being Uninsured Under the Patient Protection and Affordable Care Act (rev. Apr. 30, 2010), in Selected CBO Publications Related to Health Care Legislation, 2009-2010, p. 71 (2010).
It is of course true that the Act describes the payment as a “penalty,” not a “tax.” But while that label is fatal to the application of the Anti-Injunction Act, supra, at 544-545, it does not determine whether the payment may be viewed as an exercise of Congress’s taxing power. It is up to Congress whether to apply the Anti-Injunction Act to any particular statute, so it makes sense to be guided by Congress’s choice of label on that question. That choice does not, however, control whether an exaction is within Congress’s constitutional power to tax.
Our precedent reflects this: In 1922, we decided two challenges to the “Child Labor Tax” on the same day. In the first, we held that a suit to enjoin collection of the so-called tax was barred by the Anti-Injunction Act. George, 259 U. S., at 20. Congress knew that suits to obstruct taxes had to await payment under the Amti-Injunction Act; Congress called the child labor tax a tax; Congress therefore intended the Anti-Injunction Act to apply. In the second case, however, we held that the same exaction, although labeled a tax, was not in fact authorized by Congress’s taxing power. Drexel Furniture, 259 U. S., at 38. That constitutional question was not controlled by Congress’s choice of label.
We have similarly held that exactions not labeled taxes nonetheless were authorized by Congress’s power to tax. In the License Tax Cases, for example, we held that federal licenses to sell liquor and lottery tickets—for which the li *565 censee had to pay a fee—could be sustained as exercises of the taxing power. 5 Wall., at 471. And in New York v. United States we upheld as a tax a “surcharge” on out-of-state nuclear waste shipments, a portion of which was paid to the Federal Treasury. 505 U. S., at 171. We thus ask whether the shared responsibility payment falls within Congress’s taxing power, “[disregarding the designation of the exaction, and viewing its substance and application.” United States v. Constantine, 296 U. S. 287, 294 (1935); cf. Quill Corp. v. North Dakota, 504 U. S. 298, 310 (1992) (“[M]agic words or labels” should not “disable an otherwise constitutional levy” (internal quotation marks omitted)); Nelson v. Sears, Roebuck & Co., 312 U. S. 359, 363 (1941) (“In passing on the constitutionality of a tax law, we are concerned only with its practical operation, not its definition or the precise form of descriptive words which may be applied to it” (internal quotation marks omitted)); United States v. Sotelo, 436 U. S. 268, 275 (1978) (“That the funds due are referred to as a ‘penalty’ . . . does not alter their essential character as taxes”).[7]
Our cases confirm this functional approach. For example, in Drexel Furniture, we focused on three practical characteristics of the so-called tax on employing child laborers that convinced us the “tax” was actually a penalty. First, the tax imposed an exceedingly heavy burden—10 percent of a company’s net income—on those who employed children, no matter how small their infraction. Second, it imposed that exaction only on those who knowingly employed underage *566 laborers. Such scienter requirements are typical of punitive statutes, because Congress often wishes to punish only those who intentionally break the law. Third, this “tax” was enforced in part by the Department of Labor, an agency responsible for punishing violations of labor laws, not collecting revenue. 259 U. S., at 36-37; see also, e. g., Kurth Ranch, 511 U. S., at 780-782 (considering, inter alia, the amount of the exaction, and the fact that it was imposed for violation of a separate criminal law); Constantine, supra, at 295 (same).
The same analysis here suggests that the shared responsibility payment may for constitutional purposes be considered a tax, not a penalty: First, for most Americans the amount due will be far less than the price of insurance, and, by statute, it can never be more.[8] It may often be a reasonable financial decision to make the payment rather than purchase insurance, unlike the “prohibitory” financial punishment in Drexel Furniture. 259 U. S., at 37. Second, the individual mandate contains no scienter requirement. Third, the payment is collected solely by the IRS through the normal means of taxation—except that the Service is not allowed to use those means most suggestive of a punitive sanction, such as criminal prosecution. See § 5000A(g)(2). The reasons the Court in Drexel Furniture held that what was called a “tax” there was a penalty support the conclusion that what is called a “penalty” here may be viewed as a tax.[9]
*567 None of this is to say that the payment is not intended to affect individual conduct. Although the payment will raise considerable revenue, it is plainly designed to expand health insurance coverage. But taxes that seek to influence conduct are nothing new. Some of our earliest federal taxes sought to deter the purchase of imported manufactured goods in order to foster the growth of domestic industry. See W. Brownlee, Federal Taxation in America 22 (2d ed. 2004); cf. 2 J. Story, Commentaries on the Constitution of the United States § 962, p. 434 (1833) (“the taxing power is often, very often, applied for other purposes, than revenue”). Today, federal and state taxes can compose more than half the retail price of cigarettes, not just to raise more money, but to encourage people to quit smoking. And we have upheld such obviously regulatory measures as taxes on selling marijuana and sawed-off shotguns. See United States v. Sanchez, 340 U. S. 42, 44-45 (1950); Sonzinsky v. United States, 300 U. S. 506, 513 (1937). Indeed, “[ejvery tax is in some measure regulatory. To some extent it interposes an economic impediment to the activity taxed as compared with others not taxed.” Ibid. That § 5000A seeks to shape decisions about whether to buy health insurance does not mean that it cannot be a valid exercise of the taxing power.
In distinguishing penalties from taxes, this Court has explained that “if the concept of penalty means anything, it means punishment for an unlawful act or omission.” United States v. Reorganized CF&I Fabricators of Utah, Inc., 518 U. S. 213, 224 (1996); see also United States v. La Franca, 282 U. S. 568, 572 (1931) (“[A] penalty, as the word is here used, is an exaction imposed by statute as punishment for an unlawful act”). While the individual mandate clearly aims to induce the purchase of health insurance, it need not be *568 read to declare that failing to do so is unlawful. Neither the Act nor any other law attaches negative legal consequences to not buying health insurance, beyond requiring a payment to the IRS. The Government agrees with that reading, confirming that if someone chooses to pay rather than obtain health insurance, they have fully complied with the law. Brief for United States 60-61; Tr. of Oral Arg. 49-50 (Mar. 26, 2012).
Indeed, it is estimated that four million people each year will choose to pay the IRS rather than buy insurance. See Congressional Budget Office, Payments of Penalties, at 71. We would expect Congress to be troubled by that prospect if such conduct were unlawful. That Congress apparently regards such extensive failure to comply with the mandate as tolerable suggests that Congress did not think it was creating four million outlaws. It suggests instead that the shared responsibility payment merely imposes a tax citizens may lawfully choose to pay in lieu of buying health insurance.
The plaintiffs contend that Congress’s choice of language— stating that individuals “shall” obtain insurance or pay a “penalty”—requires reading §5000A as punishing unlawful conduct, even if that interpretation would render the law unconstitutional. We have rejected a similar argument before. In New York v. United States we examined a statute providing that “ ‘[e]ach State shall be responsible for providing ... for the disposal of. .. low-level radioactive waste.’ ” 505 U.S., at 169 (quoting 42 U. S. C. § 2021c(a)(1)(A)). A State that shipped its waste to another State was exposed to surcharges by the receiving State, a portion of which would be paid over to the Federal Government. And a State that did not adhere to the statutory scheme faced “[penalties for failure to comply,” including increases in the surcharge. § 2021e(e)(2); New York, 505 U. S., at 152-153. New York urged us to read the statute as a federal command that the state legislature enact legislation to dispose of its waste, which would have violated the Constitution. To *569 avoid that outcome, we interpreted the statute to impose only “a series of incentives” for the State to take responsibility for its waste. Id., at 170. We then sustained the charge paid to the Federal Government as an exercise of the taxing power. Id., at 169-174. We see no insurmountable obstacle to a similar approach here.[10]
The joint dissenters argue that we cannot uphold § 5000A as a tax because Congress did not “frame” it as such. Post, at 662. In effect, they contend that even if the Constitution permits Congress to do exactly what we interpret this statute to do, the law must be struck down because Congress used the wrong labels. An example may help illustrate why labels should not control here. Suppose Congress enacted a statute providing that every taxpayer who owns a house without energy efficient windows must pay $50 to the IRS. The amount due is adjusted based on factors such as taxable income and joint filing status, and is paid along with the taxpayer’s income tax return. Those whose income is below the filing threshold need not pay. The required payment is not called a “tax,” a “penalty,” or anything else. No one would doubt that this law imposed a tax, and was within Congress’s power to tax. That conclusion should not change simply because Congress used the word “penalty” to describe the payment. Interpreting such a law to be a tax *570 would hardly “[i]mpos[e] a tax through judicial legislation.” Post, at 669. Rather, it would give practical effect to the Legislature’s enactment.
Our precedent demonstrates that Congress had the power to impose the exaction in § 5000A under the taxing power, and that § 5000A need not be read to do more than impose a tax. That is sufficient to sustain it. The “question of the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise.” Woods v. Cloyd W. Miller Co., 333 U. S. 138, 144 (1948).
Even if the taxing power enables Congress to impose a tax on not obtaining health insurance, any tax must still comply with other requirements in the Constitution. Plaintiffs argue that the shared responsibility payment does not do so, citing Article I, § 9, clause 4. That clause provides: “No Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or Enumeration herein before directed to be taken.” This requirement means that any “direct Tax” must be apportioned so that each State pays in proportion to its population. According to the plaintiffs, if the individual mandate imposes a tax, it is a direct tax, and it is unconstitutional because Congress made no effort to apportion it among the States.
Even when the Direct Tax Clause was written it was unclear what else, other than a capitation (also known as a “head tax” or a “poll tax”), might be a direct tax. See Springer v. United States, 102 U. S. 586, 596-598 (1881). Soon after the framing, Congress passed a tax on ownership of carriages, over James Madison’s objection that it was an unapportioned direct tax. Id., at 597. This Court upheld the tax, in part reasoning that apportioning such a tax would make little sense, because it would have required taxing carriage owners at dramatically different rates depending on how many carriages were in their home State. See Hylton v. United States, 3 Dall. 171, 174 (1796) (opinion of Chase, J.). *571 The Court was unanimous, and those Justices who wrote opinions either directly asserted or strongly suggested that only two forms of taxation were direct: capitations and land taxes. See id., at 175; id., at 177 (opinion of Paterson, J.); id., at 183 (opinion of Iredell, J.).
That narrow view of what a direct tax might be persisted for a century. In 1880, for example, we explained that “direct taxes, within the meaning of the Constitution, are only capitation taxes, as expressed in that instrument, and taxes on real estate.” Springer, supra, at 602. In 1895, we expanded our interpretation to include taxes on personal property and income from personal property, in the course of striking down aspects of the federal income tax. Pollock v. Farmers’ Loan & Trust Co., 158 U. S. 601, 618 (1895). That result was overturned by the Sixteenth Amendment, although we continued to consider taxes on personal property to be direct taxes. See Eisner v. Macomber, 252 U. S. 189, 218-219 (1920).
A tax on going without health insurance does not fall within any recognized category of direct tax. It is not a capitation. Capitations are taxes paid by every person, “without regard to property, profession, or any other circumstance.” Hylton, supra, at 175 (opinion of Chase, J.) (emphasis altered). The whole point of the shared responsibility payment is that it is triggered by specific circumstances—earning a certain amount of income but not obtaining health insurance. The payment is also plainly not a tax on the ownership of land or personal property. The shared responsibility payment is thus not a direct tax that must be apportioned among the several States.
There may, however, be a more fundamental objection to a tax on those who lack health insurance. Even if only a tax, the payment under § 5000A(b) remains a burden that the Federal Government imposes for an omission, not an act. If it is troubling to interpret the Commerce Clause as authorizing Congress to regulate those who abstain from commerce, *572 perhaps it should be similarly troubling to permit Congress to impose a tax for not doing something.
Three considerations allay this concern. First, and most importantly, it is abundantly clear the Constitution does not guarantee that individuals may avoid taxation through inactivity. A capitation, after all, is a tax that everyone must pay simply for existing, and capitations are expressly contemplated by the Constitution. The Court today holds that our Constitution protects us from federal regulation under the Commerce Clause so long as we abstain from the regulated activity. But from its creation, the Constitution has made no such promise with respect to taxes. See Letter from Benjamin Franklin to M. Le Roy (Nov. 13, 1789), in 10 Works of Benjamin Franklin 410 (1944) (“Our new Constitution is now established . . . but in this world nothing can be said to be certain, except death and taxes”).
Whether the mandate can be upheld under the Commerce Clause is a question about the scope of federal authority. Its answer depends on whether Congress can exercise what all acknowledge to be the novel course of directing individuals to purchase insurance. Congress’s use of the Taxing Clause to encourage buying something is, by contrast, not new. Tax incentives already promote, for example, purchasing homes and professional educations. See 26 U. S. C. §§ 163(h), 25A. Sustaining the mandate as a tax depends only on whether Congress has properly exercised its taxing power to encourage purchasing health insurance, not whether it can. Upholding the individual mandate under the Taxing Clause thus does not recognize any new federal power. It determines that Congress has used an existing one.
Second, Congress’s ability to use its taxing power to influence conduct is not without limits. A few of our cases policed these limits aggressively, invalidating punitive ex-actions obviously designed to regulate behavior otherwise regarded at the time as beyond federal authority. See, e. g., United States v. Butler, 297 U. S. 1 (1936); Drexel Furniture, *573 259 U. S. 20. More often and more recently we have declined to closely examine the regulatory motive or effect of revenue-raising measures. See Kahriger, 345 U. S., at 27-31 (collecting cases). We have nonetheless maintained that “ ‘there comes a time in the extension of the penalizing features of the so-called tax when it loses its character as such and becomes a mere penalty with the characteristics of regulation and punishment.’ ” Kurth Ranch, 511 U. S., at 779 (quoting Drexel Furniture, supra, at 38).
We have already explained that the shared responsibility payment’s practical characteristics pass muster as a tax under our narrowest interpretations of the taxing power. Supra, at 567-568. Because the tax at hand is within even those strict limits, we need not here decide the precise point at which an exaction becomes so punitive that the taxing power does not authorize it. It remains true, however, that the “‘power to tax is not the power to destroy while this Court sits.’” Oklahoma Tax Comm’n v. Texas Co., 336 U. S. 342, 364 (1949) (quoting Panhandle Oil Co. v. Mississippi ex rel. Knox, 277 U. S. 218, 223 (1928) (Holmes, J., dissenting)).
Third, although the breadth of Congress’s power to tax is greater than its power to regulate commerce, the taxing power does not give Congress the same degree of control over individual behavior. Once we recognize that Congress may regulate a particular decision under the Commerce Clause, the Federal Government can bring its full weight to bear. Congress may simply command individuals to do as it directs. An individual who disobeys may be subjected to criminal sanctions. Those sanctions can include not only fines and imprisonment, but all the attendant consequences of being branded a criminal: deprivation of otherwise protected civil rights, such as the right to bear arms or vote in elections; loss of employment opportunities; social stigma; and severe disabilities in other controversies, such as custody or immigration disputes.
*574 By contrast, Congress’s authority under the taxing power is limited to requiring an individual to pay money into the Federal Treasury, no more. If a tax is properly paid, the Government has no power to compel or punish individuals subject to it. We do not make light of the severe burden that taxation—especially taxation motivated by a regulatory purpose—can impose. But imposition of a tax nonetheless leaves an individual with a lawful choice to do or not do a certain act, so long as he is willing to pay a tax levied on that choice.[11]
The Affordable Care Act’s requirement that certain individuals pay a financial penalty for not obtaining health insurance may reasonably be characterized as a tax. Because the Constitution permits such a tax, it is not our role to forbid it, or to pass upon its wisdom or fairness.
D
Justice Ginsburg questions the necessity of rejecting the Government’s commerce power argument, given that § 5000A can be upheld under the taxing power. Post, at 623. But the statute reads more naturally as a command to buy insurance than as a tax, and I would uphold it as a command if the Constitution allowed it. It is only because the Commerce Clause does not authorize such a command that it is necessary to reach the taxing power question. And it is only because we have a duty to construe a statute to save it, if fairly possible, that § 5000A can be interpreted as a tax. *575 Without deciding the Commerce Clause question, I would And no basis to adopt such a saving construction.
The Federal Government does not have the power to order people to buy health insurance. Section 5000A would therefore be unconstitutional if read as a command. The Federal Government does have the power to impose a tax on those without health insurance. Section 5000A is therefore constitutional, because it can reasonably be read as a tax.
> hH
A
The States also contend that the Medicaid expansion exceeds Congress’s authority under the Spending Clause. They claim that Congress is coercing the States to adopt the changes it wants by threatening to withhold all of a State’s Medicaid grants, unless the State accepts the new expanded funding and complies with the conditions that come with it. This, they argue, violates the basic principle that the “Federal Government may not compel the States to enact or administer a federal regulatory program.” New York, 505 U. S., at 188.
There is no doubt that the Act dramatically increases state obligations under Medicaid. The current Medicaid program requires States to cover only certain discrete categories of needy individuals—pregnant women, children, needy families, the blind, the elderly, and the disabled. 42 U. S. C. § 1396a(a)(10). There is no mandatory coverage for most childless adults, and the States typically do not offer any such coverage. The States also enjoy considerable flexibility with respect to the coverage levels for parents of needy families. § 1396a(a)(10)(A)(ii). On average States cover only those unemployed parents who make less than 37 percent of the federal poverty level, and only those employed parents who make less than 63 percent of the poverty line. Kaiser Comm’n on Medicaid and the Uninsured, Performing Under Pressure 11, and fig. 11 (2012).
*576 The Medicaid provisions of the Affordable Care Act, in contrast, require States to expand their Medicaid programs by 2014 to cover all individuals under the age of 65 with incomes below 133 percent of the federal poverty line. § 1396a(a)(10)(A)(i)(VIII). The Act also establishes a new “[e]ssential health benefits” package, which States must provide to all new Medicaid recipients—a level sufficient to satisfy a recipient’s obligations under the individual mandate. §§ 1396a(k)(1), 1396u-7(b)(5), 18022(b). The Affordable Care Act provides that the Federal Government will pay 100 percent of the costs of covering these newly eligible individuals through 2016. § 1396d(y)(l). In the following years, the federal payment level gradually decreases, to a minimum of 90 percent. Ibid. In light of the expansion in coverage mandated by the Act, the Federal Government estimates that its Medicaid spending will increase by approximately $100 billion per year, nearly 40 percent above current levels. Statement of Douglas W. Elmendorf, CBO’s Analysis of the Major Health Care Legislation Enacted in March 2010, p. 14 (Mar. 30, 2011) (Table 2).
The Spending Clause grants Congress the power “to pay the Debts and provide for the . . . general Welfare of the United States.” U. S. Const., Art. I, § 8, cl. 1. We have long recognized that Congress may use this power to grant federal funds to the States, and may condition such a grant upon the States’ “taking certain actions that Congress could not require them to take.” College Savings Bank, 527 U. S., at 686. Such measures “encourage a State to regulate in a particular way, [and] influenc[e] a State’s policy choices.” New York, supra, at 166. The conditions imposed by Congress ensure that the funds are used by the States to “provide for the . . . general Welfare” in the manner Congress intended.
At the same time, our cases have recognized limits on Congress’s power under the Spending Clause to secure state compliance with federal objectives. “We have repeatedly *577 characterized ... Spending Clause legislation as ‘much in the nature of a contract.’” Barnes v. Gorman, 536 U. S. 181, 186 (2002) (quoting Pennhurst State School and Hospital v. Halderman, 451 U. S. 1, 17, (1981)). The legitimacy of Congress’s exercise of the spending power “thus rests on whether the State voluntarily and knowingly accepts the terms of the ‘contract.’ ” Id., at 17. Respecting this limitation is critical to ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system. That system “rests on what might at first seem a counterintuitive insight, that ‘freedom is enhanced by the creation of two governments, not one.’” Bond, 564 U. S., at 220-221 (quoting Alden v. Maine, 527 U. S. 706, 758 (1999)). For this reason, “the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress’ instructions.” New York, supra, at 162. Otherwise the two-government system established by the Framers would give way to a system that vests power in one central government, and individual liberty would suffer.
That insight has led this Court to strike down federal legislation that commandeers a State’s legislative or administrative apparatus for federal purposes. See, e. g., Printz, 521 U. S., at 933 (striking down federal legislation compelling state law enforcement officers to perform federally mandated background checks on handgun purchasers); New York, supra, at 174-175 (invalidating provisions of an Act that would compel a State to either take title to nuclear waste or enact particular state waste regulations). It has also led us to scrutinize Spending Clause legislation to ensure that Congress is not using financial inducements to exert a “power akin to undue influence.” Steward Machine Co. v. Davis, 301 U. S. 548, 590 (1937). Congress may use its spending power to create incentives for States to act in accordance with federal policies. But when “pressure turns into compulsion,” ibid., the legislation runs contrary to our *578 system of federalism. “[T]he Constitution simply does not give Congress the authority to require the States to regulate.” New York, 505 U. S., at 178. That is true whether Congress directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own.
Permitting the Federal Government to force the States to implement a federal program would threaten the political accountability key to our federal system. “[Wjhere the Federal Government directs the States to regulate, it may be state officials who will bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision.” Id., at 169. Spending Clause programs do not pose this danger when a State has a legitimate choice whether to accept the federal conditions in exchange for federal funds. In such a situation, state officials can fairly be held politically accountable for choosing to accept or refuse the federal offer. But when the State has no choice, the Federal Government can achieve its objectives without accountability, just as in New York and Printz. Indeed, this danger is heightened when Congress acts under the Spending Clause, because Congress can use that power to implement federal policy it could not impose directly under its enumerated powers.
We addressed such concerns in Steward Machine. That case involved a federal tax on employers that was abated if the businesses paid into a state unemployment plan that met certain federally specified conditions. An employer sued, alleging that the tax was impermissibly “driv[ing] the state legislatures under the whip of economic pressure into the enactment of unemployment compensation laws at the bidding of the central government.” 301 U. S., at 587. We acknowledged the danger that the Federal Government might employ its taxing power to exert a “power akin to undue influence” upon the States. Id., at 590. But we observed *579 that Congress adopted the challenged tax and abatement program to channel money to the States that would otherwise have gone into the Federal Treasury for use in providing national unemployment services. Congress was willing to direct businesses to instead pay the money into state programs only on the condition that the money be used for the same purposes. Predicating tax abatement on a State’s adoption of a particular type of unemployment legislation was therefore a means to “safeguard [the Federal Government’s] own treasury.” Id., at 591. We held that “[i]n such circumstances, if in no others, inducement or persuasion does not go beyond the bounds of power.” Ibid.
In rejecting the argument that the federal law was a “weapon[] of coercion, destroying or impairing the autonomy of the states,” the Court noted that there was no reason to suppose that the State in that case acted other than through “her unfettered will.” Id., at 586, 590. Indeed, the State itself did “not offer a suggestion that in passing the unemployment law she was affected by duress.” Id., at 589.
As our decision in Steward Machine confirms, Congress may attach appropriate conditions to federal taxing and spending programs to preserve its control over the use of federal funds. In the typical case we look to the States to defend their prerogatives by adopting “the simple expedient of not yielding” to federal blandishments when they do not want to embrace the federal policies as their own. Massachusetts v. Mellon, 262 U. S. 447, 482 (1923). The States are separate and independent sovereigns. Sometimes they have to act like it.
The States, however, argue that the Medicaid expansion is far from the typical case. They object that Congress has “crossed the line distinguishing encouragement from coercion,” New York, supra, at 175, in the way it has structured the funding: Instead of simply refusing to grant the new funds to States that will not accept the new conditions, Congress has also threatened to withhold those States’ existing *580 Medicaid funds. The States claim that this threat serves no purpose other than to force unwilling States to sign up for the dramatic expansion in health care coverage effected by the Act.
Given the nature of the threat and the programs at issue here, we must agree. We have upheld Congress’s authority to condition the receipt of funds on the States’ complying with restrictions on the use of those funds, because that is the means by which Congress ensures that the funds are spent according to its view of the “general Welfare.” Conditions that do not here govern the use of the funds, however, cannot be justified on that basis. When, for example, such conditions take the form of threats to terminate other significant independent grants, the conditions are properly viewed as a means of pressuring the States to accept policy changes.
In South Dakota v. Dole, we considered a challenge to a federal law that threatened to withhold five percent of a State’s federal highway funds if the State did not raise its drinking age to 21. The Court found that the condition was “directly related to one of the main purposes for which highway funds are expended—safe interstate travel.” 483 U. S., at 208. At the same time, the condition was not a restriction on how the highway funds—set aside for specific highway improvement and maintenance efforts—were to be used.
We accordingly asked whether “the financial inducement offered by Congress” was “so coercive as to pass the point at which ‘pressure turns into compulsion.’” Id., at 211 (quoting Steward Machine, supra, at 590). By “financial inducement” the Court meant the threat of losing five percent of highway funds; no new money was offered to the States to raise their drinking ages. We found that the inducement was not impermissibly coercive, because Congress was offering only “relatively mild encouragement to the States.” Dole, 483 U. S., at 211. We observed that “all South Dakota would lose if she adheres to her chosen course as to a suitable *581 minimum drinking age is 5%” of her highway funds. Ibid. In fact, the federal funds at stake constituted less than half of one percent of South Dakota’s budget at the time. See Nat. Assn, of State Budget Officers, The State Expenditure Report 59 (1987); South Dakota v. Dole, 791 F. 2d 628, 630 (CA8 1986). In consequence, “we conclude[d] that [the] encouragement to state action [was] a valid use of the spending power.” Dole, 483 U. S., at 212. Whether to accept the drinking age change “remained] the prerogative of the States not merely in theory but in fact.” Id., at 211-212.
In this case, the financial “inducement” Congress has chosen is much more than “relatively mild encouragement”—it is a gun to the head. Section 1396c of the Medicaid Act provides that if a State’s Medicaid plan does not comply with the Act’s requirements, the Secretary of Health and Human Services may declare that “further payments will not be made to the State.” 42 U. S. C. § 1396c. A State that opts out of the Affordable Care Act’s expansion in health care coverage thus stands to lose not merely “a relatively small percentage” of its existing Medicaid funding, but all of it. Dole, supra, at 211. Medicaid spending accounts for over 20 percent of the average State’s total budget, with federal funds covering 50 to 83 percent of those costs. See Nat. Assn, of State Budget Officers, Fiscal Year 2010 State Expenditure Report, p. 11 (2011) (Table 5); 42 U. S. C. § 1396d(b). The Federal Government estimates that it will pay out approximately $3.3 trillion between 2010 and 2019 in order to cover the costs of pre-expansion Medicaid. Brief for United States 10, n. 6. In addition, the States have developed intricate statutory and administrative regimes over the course of many decades to implement their objectives under existing Medicaid. It is easy to see how the Dole Court could conclude that the threatened loss of less than half of one percent of South Dakota’s budget left that State with a “prerogative” to reject Congress’s desired policy, “not merely in theory but in fact.” 483 U. S., at 211-212. *582 The threatened loss of over 10 percent of a State’s overall budget, in contrast, is economic dragooning that leaves the States with no real option but to acquiesce in the Medicaid expansion.[12]
Justice Ginsburg claims that Dole is distinguishable because here “Congress has not threatened to withhold funds earmarked for any other program.” Post, at 633. But that begs the question: The States contend that the expansion is in reality a new program and that Congress is forcing them to accept it by threatening the funds for the existing Medicaid program. We cannot agree that existing Medicaid and the expansion dictated by the Affordable Care Act are all one program simply because “Congress styled” them as such. Post, at 635. If the expansion is not properly viewed as a modification of the existing Medicaid program, Congress’s decision to so title it is irrelevant.[13]
Here, the Government claims that the Medicaid expansion is properly viewed merely as a modification of the exist *583 ing program because the States agreed that Congress could change the terms of Medicaid when they signed on in the first place. The Government observes that the Social Security Act, which includes the original Medicaid provisions, contains a clause expressly reserving “[t]he right to alter, amend, or repeal any provision” of that statute. 42 U. S. C. § 1304. So it does. But “if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.” Pennhurst, 451 U. S., at 17. A State confronted with statutory language reserving the right to “alter” or “amend” the pertinent provisions of the Social Security Act might reasonably assume that Congress was entitled to make adjustments to the Medicaid program as it developed. Congress has in fact done so, sometimes conditioning only the new funding, other times both old and new. See, e. g., Social Security Amendments of 1972, 86 Stat. 1381-1382, 1465 (extending Medicaid eligibility, but partly conditioning only the new funding); Omnibus Budget Reconciliation Act of 1990, § 4601, 104 Stat. 1388-166 (extending eligibility, and conditioning old and new funds).
The Medicaid expansion, however, accomplishes a shift in kind, not merely degree. The original program was designed to cover medical services for four particular categories of the needy: the disabled, the blind, the elderly, and needy families with dependent children. See 42 U. S. C. § 1396a(a)(10). Previous amendments to Medicaid eligibility merely altered and expanded the boundaries of these categories. Under the Affordable Care Act, Medicaid is transformed into a program to meet the health care needs of the entire nonelderly population with income below 133 percent of the poverty level. It is no longer a program to care for the neediest among us, but rather an element of a comprehensive national plan to provide universal health insurance coverage.[14]
*584 Indeed, the manner in which the expansion is structured indicates that while Congress may have styled the expansion a mere alteration of existing Medicaid, it recognized it was enlisting the States in a new health care program. Congress created a separate funding provision to cover the costs of providing services to any person made newly eligible by the expansion. While Congress pays 50 to 83 percent of the costs of covering individuals currently enrolled in Medicaid, § 1396d(b), once the expansion is fully implemented Congress will pay 90 percent of the costs for newly eligible persons, § 1396d(y)(1). The conditions on use of the different funds are also distinct. Congress mandated that newly eligible persons receive a level of coverage that is less comprehensive than the traditional Medicaid benefit package. § 1396a(k)(l); see Brief for United States 9.
As we have explained, “[t]hough Congress’ power to legislate under the spending power is broad, it does not include surprising participating States with postacceptance or ‘retroactive’ conditions.” Pennhurst, supra, at 25. A State could hardly anticipate that Congress’s reservation of the right to “alter” or “amend” the Medicaid program included the power to transform it so dramatically.
Justice Ginsburg claims that in fact this expansion is no different from the previous changes to Medicaid, such that “a State would be hard put to complain that it lacked fair notice.” Post, at 641. But the prior change she discusses—presumably the most dramatic alteration she could find—does not come close to working the transformation the *585 expansion accomplishes. She highlights an amendment requiring States to cover pregnant women and increasing the number of eligible children. Ibid. But this modification can hardly be described as a major change in a program that—from its inception—provided health care for “families with dependent children.” Previous Medicaid amendments simply do not fall into the same category as the one at stake here.
The Court in Steward Machine did not attempt to “fix the outermost line” where persuasion gives way to coercion. 301 U. S., at 591. The Court found it “[ejnough for present purposes that wherever the line may be, this statute is within it.” Ibid. We have no need to fix a line either. It is enough for today that wherever that line may be, this statute is surely beyond it. Congress may not simply “conscript state [agencies] into the national bureaucratic army,” FERC v. Mississippi, 456 U. S. 742, 775 (1982) (O’Connor, J., concurring in judgment in part and dissenting in part), and that is what it is attempting to do with the Medicaid expansion.
B
Nothing in our opinion precludes Congress from offering funds under the Affordable Care Act to expand the availability of health care, and requiring that States accepting such funds comply with the conditions on their use. What Congress is not free to do is to penalize States that choose not to participate in that new program by taking away their existing Medicaid funding. Section 1396c gives the Secretary of Health and Human Services the authority to do just that. It allows her to withhold all “further [Medicaid] payments ... to the State” if she determines that the State is out of compliance with any Medicaid requirement, including those contained in the expansion. 42 U. S. C. § 1396c. In light of the Court’s holding, the Secretary cannot apply § 1396c to withdraw existing Medicaid funds for failure to comply with the requirements set out in the expansion.
*586 That fully remedies the constitutional violation we have identified. The chapter of the United States Code that contains § 1396c includes a severability clause confirming that we need go no further. That clause specifies that “[i]f any provision of this chapter, or the application thereof to any person or circumstance, is held invalid, the remainder of the chapter, and the application of such provision to other persons or circumstances shall not be affected thereby.” § 1303. Today’s holding does not affect the continued application of § 1396c to the existing Medicaid program. Nor does it affect the Secretary’s ability to withdraw funds provided under the Affordable Care Act if a State that has chosen to participate in the expansion fails to comply with the requirements of that Act.
This is not to say, as the joint dissent suggests, that we are “rewriting the Medicaid Expansion.” Post, at 691. Instead, we determine, first, that § 1396c is unconstitutional when applied to withdraw existing Medicaid funds from States that decline to comply with the expansion. We then follow Congress’s explicit textual instruction to leave unaffected “the remainder of the chapter, and the application of [the challenged] provision to other persons or circumstances.” §1303. When we invalidate an application of a statute because that application is unconstitutional, we are not “rewriting” the statute; we are merely enforcing the Constitution.
The question remains whether today’s holding affects other provisions of the Affordable Care Act. In considering that question, “[w]e seek to determine what Congress would have intended in light of the Court’s constitutional holding.” United States v. Booker, 543 U. S. 220, 246 (2005) (internal quotation marks omitted). Our “touchstone for any decision about remedy is legislative intent, for a court cannot use its remedial powers to circumvent the intent of the legislature.” Ayotte v. Planned Parenthood of Northern New Eng., 546 U. S. 320, 330 (2006) (internal quotation marks omitted). *587 The question here is whether Congress would have wanted the rest of the Act to stand, had it known that States would have a genuine choice whether to participate in the new Medicaid expansion. Unless it is “evident” that the answer is no, we must leave the rest of the Act intact. Champlin Refining Co. v. Corporation Comm’n of Okla., 286 U. S. 210, 234 (1932).
We are confident that Congress would have wanted to preserve the rest of the Act. It is fair to say that Congress assumed that every State would participate in the Medicaid expansion, given that States had no real choice but to do so. The States contend that Congress enacted the rest of the Act with such full participation in mind; they point out that Congress made Medicaid a means for satisfying the mandate, 26 U. S. C. § 5000A(f)(1)(A)(ii), and enacted no other plan for providing coverage to many low-income individuals. According to the States, this means that the entire Act must fall.
We disagree. The Court today limits the financial pressure the Secretary may apply to induce States to accept the terms of the Medicaid expansion. As a practical matter, that means States may now choose to reject the expansion; that is the whole point. But that does not mean all or even any will. Some States may indeed decline to participate, either because they are unsure they will be able to afford their share of the new funding obligations, or because they are unwilling to commit the administrative resources necessary to support the expansion. Other States, however, may voluntarily sign up, finding the idea of expanding Medicaid coverage attractive, particularly given the level of federal funding the Act offers at the outset..
We have no way of knowing how many States will accept the terms of the expansion, but we do not believe Congress would have wanted the whole Act to fall, simply because some may choose not to participate. The other reforms Congress enacted, after all, will remain “fully operative as a law,” Champlin, supra, at 234, and will still function in a *588 way “consistent with Congress’ basic objectives in enacting the statute,” Booker, supra, at 259. Confident that Congress would not have intended anything different, we conclude that the rest of the Act need not fall in light of our constitutional holding.
⅝ ⅜ ⅝
The Affordable Care Act is constitutional in part and unconstitutional in part. The individual mandate cannot be upheld as an exercise of Congress’s power under the Commerce Clause. That Clause authorizes Congress to regulate interstate commerce, not to order individuals to engage in it. In this case, however, it is reasonable to construe what Congress has done as increasing taxes on those who have a certain amount of income, but choose to go without health insurance. Such legislation is within Congress’s power to tax.
As for the Medicaid expansion, that portion of the Affordable Care Act violates the Constitution by threatening existing Medicaid funding. Congress has no authority to order the States to regulate according to its instructions. Congress may offer the States grants and require the States to comply with accompanying conditions, but the States must have a genuine choice whether to accept the offer. The States are given no such choice in this case: They must either accept a basic change in the nature of Medicaid, or risk losing all Medicaid funding. The remedy for that constitutional violation is to preclude the Federal Government from imposing such a sanction. That remedy does not require striking down other portions of the Affordable Care Act.
The Framers created a Federal Government of limited powers, and assigned to this Court the duty of enforcing those limits. The Court does so today. But the Court does not express any opinion on the wisdom of the Affordable Care Act. Under the Constitution, that judgment is reserved to the people.
*589 The judgment of the Court of Appeals for the Eleventh Circuit is affirmed in part and reversed in part.

It is so ordered.

 The Eleventh Circuit did not consider whether the Anti-Injunction Act bars challenges to the individual mandate. The District Court had determined that it did not, and neither side challenged that holding on appeal. The same was true in the Fourth Circuit, but that court examined the question sua sponte because it viewed the Anti-Injunction Act as a limit on its subject matter jurisdiction. See Liberty Univ., 671 F. 3d, at 400-401. The Sixth Circuit and the D. C. Circuit considered the question but determined that the Anti-Injunction Act did not apply. See Thomas More, 651 F. 3d, at 539-540 (CA6); Seven-Sky, 661 F. 3d, at 5-14 (CADC).

 We appointed H. Bartow Farr III to brief and argue in support of the Eleventh Circuit’s judgment with respect to severability, and Robert A. Long to brief and argue the proposition that the Anti-Injunction Act bars the current challenges to the individual mandate. 565 U. S. 1048 (2011). Both amici have ably discharged their assigned responsibilities.

 The examples of other congressional mandates cited by Justice Ginsburg, post, at 621, n. 10 (opinion concurring in part, concurring in judgment in part, and dissenting in part), are not to the contrary. Each of those mandates—to report for jury duty, to register for the draft, to purchase firearms in anticipation of militia service, to exchange gold currency for paper currency, and to file a tax return—are based on constitutional provisions other than the Commerce Clause. See Art. I, § 8, cl. 9 (to “constitute Tribunals inferior to the supreme Court”); id., cl. 12 (to “raise and support Armies”); id., cl. 16 (to “provide for organizing, arming, and disciplining, the Militia”); id., cl. 5 (to “coin Money”); id., cl. 1 (to “lay and collect Taxes").

 Justice Ginsburg suggests that “at the time the Constitution was framed, to ‘regulate’ meant, among other things, to require action.” Post, at 610 (citing Seven-Sky v. Holder, 661 F. 3d 1, 16 (CADC 2011); brackets and some internal quotation marks omitted). But to reach this conclusion, the case cited by Justice Ginsburg relied on a dictionary in which “[t]o order; to command” was the fifth-alternative definition of “to direct,” which was itself the second-alternative definition of “to regulate.” See id., at 16 (citing S. Johnson, Dictionary of the English Language (4th ed. 1773) (reprinted 1978)). It is unlikely that the Framers had such an obscure meaning in mind when they used the word “regulate.” Far more commonly, “[t]o regulate” meant “[t]o adjust by rule or method,” which *551 presupposes something to adjust. 2 id., at 1619; see also Gibbons, 9 Wheat., at 196 (defining the commerce power as the power “to prescribe the rule by which commerce is to be governed”).

 Justice Ginsburg cites two eminent domain cases from the 1890s to support the proposition that our case law does not “toe the activity versus inactivity line.” Post, at 611 (citing Monongahela Nav. Co. v. United States, 148 U. S. 312, 335-337 (1893), and Cherokee Nation v. Southern Kansas R. Co., 135 U. S. 641, 657-659 (1890)). The fact that the Fifth Amendment requires the payment of just compensation when the Government exercises its power of eminent domain does not turn the taking into a commercial transaction between the landowner and the Government, let alone a government-compelled transaction between the landowner and a third party.

 In an attempt to recast the individual mandate as a regulation of commercial activity, Justice Ginsburg suggests that “[a]n individual who opts not to purchase insurance from a private insurer can be seen as actively selecting another form of insurance: self-insurance.” Post, at 612. But “self-insurance” is, in this context, nothing more than a description of the failure to purchase insurance. Individuals are no more “aetiv[e] in the self-insurance market” when they fail to purchase insurance, post, at 613, than they are active in the “rest” market when doing nothing.

 Sotelo, in particular, would seem to refute the joint dissent’s contention that we have “never” treated an exaction as a tax if it was denominated a penalty. Post, at 664. We are not persuaded by the dissent’s attempt to distinguish Sotelo as a statutory construction case from the bankruptcy context. Post, at 661, n. 5. The dissent itself treats the question here as one of statutory interpretation, and indeed also relies on a statutory interpretation case from the bankruptcy context. Post, at 667 (citing United States v. Reorganized CF&I Fabricators of Utah, Inc., 518 U. S. 213, 224 (1996)).

 In 2016, for example, individuals making $35,000 a year are expected to owe the IRS about $60 for any month in which they do not have health insurance. Someone with an annual income of $100,000 a year would likely owe about $200. The price of a qualifying insurance policy is projected to be around $400 per month. See D. Newman, CRS Report for Congress, Individual Mandate and Related Information Requirements Under PPACA 7, and n. 25 (2011).

 We do not suggest that any exaction lacking a scienter requirement and enforced by the IRS is within the taxing power. See post, at 667-668 (joint opinion of Scalia, Kennedy, Thomas, and Alito, JJ., dissenting). Congress could not, for example, expand its authority to impose criminal fines by creating strict liability offenses enforced by the IRS rather than *567 the FBI. But the fact the exaction here is paid like a tax, to the agency that collects taxes—rather than, for example, exacted by Department of Labor inspectors after ferreting out willful malfeasance—suggests that this exaction may be viewed as a tax.

 The joint dissent attempts to distinguish New York v. United States on the ground that the seemingly imperative language in that case was in an “introductory provision” that had “no legal consequences.” Post, at 663. We did not rely on that reasoning in New York. See 505 U. S., at 169-170. Nor could we have. While the Court quoted only the broad statement that “[e]ach State shall be responsible” for its waste, that language was implemented through operative provisions that also use the words on which the dissent relies. See 42 U. S. C. § 2021e(e)(1) (entitled “Requirements for non-sited compact regions and non-member States” and directing that those entities “shall comply with the following requirements”); §2021e(e)(2) (describing “Penalties for failure to comply”). The Court upheld those provisions not as lawful commands, but as “incentives.” See 505 U. S., at 152-153, 171-173.

 Of course, individuals do not have a lawful choice not to pay a tax due, and may sometimes face prosecution for failing to do so (although not for declining to make the shared responsibility payment, see 26 U. S. C. § 5000A(g)(2)). But that does not show that the tax restricts the lawful choice whether to undertake or forgo the activity on which the tax is predicated. Those subject to the individual mandate may lawfully forgo health insurance and pay higher taxes, or buy health insurance and pay lower taxes. The only thing they may not lawfully do is not buy health insurance and not pay the resulting tax.

 Justice Ginsburg observes that state Medicaid spending will increase by only 0.8 percent after the expansion. Post, at 628. That not only ignores increased state administrative expenses, but also assumes that the Federal Government will continue to fund the expansion at the current statutorily specified levels. It is not unheard of, however, for the Federal Government to increase requirements in such a manner as to impose unfunded mandates on the States. More importantly, the size of the new financial burden imposed on a State is irrelevant in analyzing whether the State has been coerced into accepting that burden. “Your money or your life” is a coercive proposition, whether you have a single dollar in your pocket or $500.

 Nor, of course, can the number of pages the amendment occupies, or the extent to which the change preserves and works within the existing program, be dispositive. Cf. post, at 635 (opinion of Ginsburg, J.). Take, for example, the following hypothetical amendment: “All of a State’s citizens are now eligible for Medicaid.” That change would take up a single line and would not alter any “operational aspect[] of the program” beyond the eligibility requirements. Post, at 634. Yet it could hardly be argued that such an amendment was a permissible modification of Medicaid, rather than an attempt to foist an entirely new health care system upon the States.

 Justice Ginsburg suggests that the States can have no objection to the Medicaid expansion, because “Congress could have repealed Medicaid [and,] [thereafter, . . . could have enacted Medicaid II, a new program *584 combining the pre-2010 coverage with the expanded coverage required by the ACA.” Post, at 636-637; see also post, at 624. But it would certainly not be that easy. Practical constraints would plainly inhibit, if not preclude, the Federal Government from repealing the existing program and putting every feature of Medicaid on the table for political reconsideration. Such a massive undertaking would hardly be “ritualistic.” Ibid. The same is true of Justice Ginsburg’s suggestion that Congress could establish Medicaid as an exclusively federal program. Post, at 630.