**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CHARLES G. MOORE; KATHLEEN F. MOORE, | No. 20-36122 |
| *Plaintiffs-Appellants*, | D.C. No. 2:19-cv-01539-JCC |
| v. | |
| UNITED STATES OF AMERICA, *Defendant-Appellee.* | OPINION |

Appeal from the United States District Court
for the Western District of Washington
John C. Coughenour, District Judge, Presiding

Argued and Submitted January 14, 2022
San Francisco, California

Filed June 7, 2022

Before: Ronald M. Gould, Jacqueline H. Nguyen, and
Mark J. Bennett, Circuit Judges.

Opinion by Judge Gould

# SUMMARY[*]

## Tax

The panel affirmed the district court's dismissal of an action seeking to invalidate the Mandatory Repatriation Tax.

Taxpayers invested in a controlled foreign corporation (CFC), which is a foreign corporation whose ownership or voting rights are more than 50% owned by U.S. persons. Traditionally, U.S. taxpayers generally did not pay U.S. taxes on foreign earnings until those earnings were distributed to them. However, when particular categories of undistributed earnings were repatriated to the U.S.—through a distribution or loan to U.S. shareholders, or an investment in U.S. property— U.S. shareholders who owned at least 10% of a CFC could be taxed on a proportionate share of those earnings. The primary method used to tax a CFC's U.S. shareholders on foreign earnings held offshore was a provision of the tax code called Subpart F.

In 2017, the Tax Cuts and Jobs Act (TCJA) created a new, one-time tax: the Mandatory Repatriation Tax (MRT). Under the MRT's modified version of Subpart F, U.S. persons owning at least 10% of a CFC are taxed on the CFC's profits after 1986, regardless of whether the CFC distributed earnings. Additionally, going forward, a CFC's income taxable under subpart F includes current earnings from its business.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Taxpayers challenged the constitutionality of Subpart F's ability to permit taxation of a CFC's income after 1986 through the MRT. The district court dismissed the action for failure to state a claim, denied taxpayers' cross-motion for summary judgment, and taxpayers appealed.

The panel first held that, given the background of the government's power to lay and collect taxes, the MRT is consistent with the Apportionment Clause. That clause requires that a direct tax must be apportioned so that each state pays in proportion to its population. The panel acknowledged that the Sixteenth Amendment exempts from the apportionment requirement the category of "incomes, from whatever source derived." The panel observed that courts have consistently upheld the constitutionality of taxes similar to the MRT notwithstanding any difficulty in defining income, that the realization of income does not determine the tax's constitutionality, and that there is no constitutional ban on Congress disregarding the corporate form to facilitate taxation of shareholders' income. The panel explained that Subpart F only applies to U.S. persons owning at least 10% of a CFC, the MRT builds upon a preexisting liability attributing a CFC's income to its shareholders, and taxpayers were, and continue to be, treated as individuals who have some ability to control distribution.

The panel also held that, assuming without deciding that the MRT is retroactive, the MRT does not violate the Fifth Amendment's Due Process Clause. The panel explained that the MRT serves the legitimate purpose of preventing CFC shareholders who have not yet received distributions from obtaining a windfall by never having to pay taxes on their offshore earnings that have not yet been distributed. The MRT accomplished this legitimate purpose by rational means: by accelerating the effective repatriation date of

undistributed CFC earnings to a date following passage of the TCJA.

## COUNSEL

Andrew M. Grossman (argued), David B. Rivkin, Jr., Jeffrey H. Paravano, and Sean Sandoloski, Baker Hostetler, Washington, D.C.; Sam Kazman and Devin Watkins, Competitive Enterprise Institute, Washington, D.C.; for Plaintiffs-Appellants.

Nathaniel S. Pollock (argued), Francesca Ugolini, and Michael J. Haungs, Attorneys, Tax Division; David A. Hubbert, Acting Assistant Attorney General; Tessa Gorman, Acting United States Attorney; United States Department of Justice, Washington, D.C.; for Defendant-Appellee.

## OPINION

GOULD, Circuit Judge:

Charles and Kathleen Moore (the "Moores") seek to invalidate the Mandatory Repatriation Tax ("MRT") on the grounds that it violates the Constitution's Apportionment Clause and Fifth Amendment's Due Process Clause. The Moores, however, have staked out a position for which we can find no persuasive authority. We affirm the district court's dismissal of the Moores' action.

### FACTS AND PROCEDURAL HISTORY

In 2005, the Moores invested in KisanKraft, a company owned by their friend which supplies modern tools to small

farmers in India. The Moores invested $40,000 in return for 11% of the common shares. KisanKraft is a controlled foreign corporation ("CFC"), which means that it is a foreign corporation whose ownership or voting rights are more than 50% owned by U.S. persons.

KisanKraft is located in India, and the Moores have never participated in its day-to-day operations or management. While KisanKraft has turned a profit every year, KisanKraft has never distributed any earnings to its shareholders. Instead, KisanKraft has reinvested all of its earnings as additional shareholder investments in its business.

Traditionally, U.S. taxpayers generally did not pay U.S. taxes on foreign earnings until those earnings were distributed to them. This system created a strong incentive for CFCs to separately incorporate their foreign operations, allowing U.S. taxpayers to pay taxes only if and when earnings were repatriated to the U.S. By 2015, CFCs had accumulated an estimated $2.6 trillion in earnings offshore that were not presently subject to U.S. taxation.

Before 2017, the primary method used to tax a CFC's U.S. shareholders on foreign earnings held offshore was a provision of the tax code called Subpart F. *See* 26 U.S.C. § 951 (2007). Subpart F permitted the taxation of certain types of a U.S. person's CFC earnings when that U.S. person owned at least 10% of a CFC's voting stock. *Id.* Specifically, U.S. shareholders who owned at least 10% of a CFC could be taxed on a proportionate share of particular categories of its undistributed earnings such as dividends, interest, and earnings invested in certain U.S. property. *Id.* § 951(a). Neither Subpart F nor any other provision of the tax code permitted the U.S. Government to tax U.S. shareholders on the CFC's active business income

attributable to the CFC's own business held offshore, such as when a CFC manufactures and sells products to a third party in a foreign country. Such income was only taxable if and when repatriated to the U.S. through a distribution to U.S. shareholders, loan to U.S. shareholders, or an investment in U.S. property.

In 2017, Congress passed, and President Trump signed into law, the Tax Cuts and Jobs Act ("TCJA"). *See* 131 Stat. 2054 (2017). The TCJA transformed U.S. corporate taxation from a worldwide system, where corporations were generally taxed regardless of where their profits were derived, toward a territorial system, where corporations are generally taxed only on their domestic source profits. As part of this change, the TCJA created a new, one-time tax: the MRT. The MRT modified Subpart F by classifying CFC earnings after 1986 as income taxable in 2017. *See* 26 U.S.C. §§ 965(a), (d) (2017). Under this revised version of Subpart F, U.S. persons owning at least 10% of a CFC are taxed on the CFC's profits after 1986 at either 15.5% for earnings held in cash or 8% otherwise. *Id.* § 965(c). The MRT imposes this tax regardless of whether the CFC distributed earnings. It also modified CFC taxes going forward: effective January 1, 2018, a CFC's income taxable under Subpart F includes current earnings from its business.

The TCJA also included tax benefits for shareholders of CFCs. When CFCs repatriate untaxed earnings as dividends to U.S. shareholders subject to the MRT, those earnings are generally not taxed. *See* 26 U.S.C. § 245A(a). Further, the TCJA effectively eliminated any other taxes on a CFC's undistributed earnings and profits before 2018.

The Government estimates that the MRT will generate $340 billion in tax revenue.

In 2018, the Moores learned about the MRT. According to their CPA's calculations, their tax liability for 2017 increased by roughly $15,000 because of the MRT. This tax liability was based on their pro rata share of KisanKraft's retained earnings of $508,000, subjecting them to an additional $132,512 in taxable income.

The Moores challenged the constitutionality of Subpart F's ability to permit the taxation of a CFC's income after 1986 through the MRT. The district court granted the Government's motion to dismiss for failure to state a claim and denied the Moores' cross-motion for summary judgment. It held that the MRT taxed income and, although it was retroactive, did not violate the Fifth Amendment's Due Process Clause.

After the district court's dismissal, the Moores timely appealed. We affirm the district court's order.

## STANDARD OF REVIEW

We review *de novo* both the constitutionality of a statute and a motion to dismiss for failure to state a claim. *United States v. Mohamud*, 843 F.3d 420, 432 (9th Cir. 2016) (constitutionality of statute); *Dougherty v. City of Covina*, 654 F.3d 892, 897 (9th Cir. 2011) (motion to dismiss for failure to state a claim).

## DISCUSSION

The Moores raise two constitutional challenges to the MRT: (1) they contend that it violates the Apportionment Clause, and (2) they contend that it violates the Fifth Amendment's Due Process Clause.

Because the MRT imposed on CFCs is a novel concept, it is worth dwelling for a moment on some general principles that guide us. The federal government is, of course, a government of limited and specified powers. *See, e.g., Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 533–534 (2012). One of those enumerated powers of Congress is the power to "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. CONST. art. I, § 8, cl. 1. Congress's power to tax was a central force behind the Constitution. *See Hylton v. United States*, 3 U.S. (3 Dall.) 171, 173 (1796) ("The great object of the Constitution was, to give Congress a power to lay taxes, adequate to the exigencies of government"). Further, it has long been established that the federal government may adopt laws that are necessary and proper to effectuate its legitimate purposes. The Constitution gives Congress the power "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. CONST. art. I, § 8, cl. 18; *see also McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 323–25 (1819).

Once the federal government decides to tax something, then, subject to any constitutional limitations, its power to tax and flexibility as to how to accomplish that must necessarily be broad. *See, e.g., Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013) (stating that the Spending Clause "provides Congress broad discretion to tax"); *NFIB*, 567 U.S. at 573 ("[T]he breadth of Congress's power to tax is greater than its power to regulate commerce"). It is also clear that Congress has sought to exercise the full scope of its constitutionally provided power to tax. *See Comm'r v. Glenshaw Glass Co.*, 348 U.S. 426,

429 (1955) (noting that the definition of "gross income" to be reported by taxpayers "was used by Congress to exert in this field 'the full measure of its taxing power.'" (quoting *Helvering v. Clifford*, 309 U.S. 331, 334 (1940))).  Given Congress's expansive intent in taxing gross income, "exclusions from gross income are construed narrowly in favor of taxation." *Comm'r v. Dunkin*, 500 F.3d 1065, 1069 (9th Cir. 2007).  It is against this background that we must decide whether the MRT offends the U.S. Constitution's Apportionment Clause or its Due Process Clause.

## I.  The MRT does not violate the Apportionment Clause

The Constitution's Apportionment Clause provides that "No Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or Enumeration herein before directed to be taken." U.S. CONST. art. I, § 9, cl. 4. "This requirement means that any 'direct Tax' must be apportioned so that each State pays in proportion to its population." *NFIB*, 567 U.S. at 570.  The Apportionment Clause traditionally applied to only capitations[1] and land taxes. *See id.* at 571 ("[D]*irect taxes*, within the meaning of the Constitution, are only capitation taxes, as expressed in that instrument, and taxes on real estate." (quoting *Springer v. United States*, 102 U.S. 586, 602 (1881))).  While the Supreme Court in *Pollock v. Farmers' Loan & Tr. Co.,* held that income from personal property was subject to the Apportionment Clause, *see* 158 U.S. 601, 618 (1895), the Sixteenth Amendment overruled this result, further

---

[1] "Capitations are taxes paid by every person, without regard to property, profession, or any other circumstance." *NFIB*, 567 U.S. at 571 (simplified).

reinforcing the narrow reach of the Apportionment Clause, *see NFIB*, 567 U.S. at 571.

The Sixteenth Amendment, ratified in 1913, exempts from the apportionment requirement the expansive category of "incomes, from whatever source derived." *See* U.S. CONST. amend. XVI. In *United States v. James*, we noted the difficulty of categorically defining everything that constitutes income. *See* 333 F.2d 748, 753 (9th Cir. 1964) (en banc) ("The courts have given a wide scope to the income tax, but have realized that the borderline content of 'income' must be determined case by case. Essentially the concept of income is a flexible one . . . ." (quoting Stanley S. Surrey & William C. Warren, *The Income Tax Project of the American Law Institute: Gross Income, Deductions, Accounting, Gains and Losses, Cancellation of Indebtedness*, 66 Harv. L. Rev. 761, 770–71 (1953))).

Despite the difficulty in defining income, courts have held consistently that taxes similar to the MRT are constitutional. In *Eder v. Commissioner of Internal Revenue*, the Second Circuit held that the inclusion of foreign corporate income under a statute predating Subpart F was constitutional. *See* 138 F.2d 27, 28–29 (2d Cir. 1943). Thirty years later, the United States Tax Court upheld pre-MRT provisions of Subpart F against constitutional challenges, and the decisions were affirmed by the Second and Tenth Circuits. *See Whitlock's Est. v. Comm'r*, 59 T.C. 490, 508 (1972), *aff'd in part, rev'd in part*, 494 F.2d 1297, 1298–99, 1301 (10th Cir. 1974) (upholding constitutionally of Subpart F provision taxing "a corporation's undistributed current income to the corporation's controlling stockholders."); *Garlock Inc. v. Comm'r*, 489 F.2d 197, 202 (2d Cir. 1973) (affirming Tax Court's ruling that a CFC's Subpart F income was attributable to shareholders even if

that income had not been distributed and stating that the argument it is unconstitutional "borders on the frivolous in the light of [the Second Circuit's] decision in *Eder*").

Whether the taxpayer has realized income does not determine whether a tax is constitutional.  In *Heiner v. Mellon*, the Supreme Court stated that whether or not a "partner's proportionate share of the net income of the partnership" was distributable was not material to whether it could be taxed.  304 U.S. 271, 281 (1938).  Similarly in *Eder*, the Second Circuit noted that "[i]n a variety of circumstances it has been held that the fact that the distribution of income is prevented by operation of law, or by agreement among private parties, is no bar to its taxability."  138 F.2d at 28 (citing *Heiner*, 304 U.S. at 281; *Helvering v. Enright's Est.*, 312 U.S. 636, 641 (1941)).  And, the Supreme Court has made clear that realization of income is not a constitutional requirement.  *See Helvering v. Horst*, 311 U.S. 112, 116 (1940) ("[T]he rule that income is not taxable until realized . . . . [is] founded on administrative convenience . . . and [is] not one of exemption from taxation where the enjoyment is consummated by some event other than the taxpayer's personal receipt of money or property."); *see also Helvering v. Griffiths*, 318 U.S. 371, 393–94 (1943) (explaining that *Horst* "undermined . . . the original theoretical bases" of a constitutional realization requirement).

What constitutes a taxable gain is also broadly construed. In *Helvering v. Bruun*, the Supreme Court determined that a lessee's improvements to the land were a taxable gain when the lessor regained possession of the land.  309 U.S. 461, 469 (1940).  The Court instructed that a taxable "[g]ain may occur as a result of exchange of property, payment of the taxpayer's indebtedness, relief from liability, or profit realized from the completion of a transaction."  *Id.*  We

applied this precedent nearly half a century later, holding that the cancellation of indebtedness was a taxable gain. *See Vukasovich, Inc. v. Comm'r*, 790 F.2d 1409, 1415 (9th Cir. 1986) ("We have no doubt that an increase in wealth from the cancellation of indebtedness is taxable where the taxpayer received something of value in exchange for the indebtedness.").

Further, there is no blanket constitutional ban on Congress disregarding the corporate form to facilitate taxation of shareholders' income. In other words, there is no constitutional prohibition against Congress attributing a corporation's income pro-rata to its shareholders. *See, e.g.*, *Dougherty v. Comm'r*, 60 T.C. 917, 928 (1973) (noting that nothing "prevent[s] Congress from bypassing the corporate entity in determining the incidence of Federal income taxation."). And here, there is no dispute that KisanKraft actually earned significant income, though all tax that the Moores' owed the U.S. Government on their pro-rata share of KisanKraft was deferred until the MRT went into effect in 2017.

Given this background, we hold that the revised Subpart F is consistent with the Apportionment Clause. As modified by the MRT, Subpart F only applies to U.S. persons owning at least 10% of a CFC. The MRT builds upon these U.S. persons' preexisting tax liability attributing a CFC's income to its shareholders. Before the MRT, U.S. persons owning at least 10% of a CFC were already subject to certain taxes on the CFC's income. Minority owners like the Moores were, and after the passage of the MRT continue to be, treated as individuals who have some ability to control distribution. *See id.* ("In subpart F, Congress has singled out a particular class of taxpayers . . . whose degree of control over their foreign corporation allows them to treat the

corporation's undistributed earnings as they see fit."). Further, the MRT applies to taxable gains. Clearly, KisanKraft earned significant income, and the MRT assigns only a pro-rata share of that income to the Moores.

Relying on *Eisner v. Macomber*, 252 U.S. 189, 219 (1920), and *Glenshaw Glass*, 348 U.S. at 431, the Moores argue that the MRT is an unapportioned direct tax. Specifically, the Moores argue that *Macomber* and *Glenshaw Glass* require income to be realized before it can be taxed. They urge us to adopt and apply the purported definition of income used in *Glenshaw Glass*, which would require "[1] undeniable accessions to wealth, [2] clearly realized, and [3] over which the taxpayers have complete dominion." 348 U.S. at 431. The Moores' reliance on these cases is misplaced: the Supreme Court, our court, and other courts have narrowly interpreted *Macomber* and *Glenshaw Glass*, and *Glenshaw Glass*'s definition is not applicable here.

First, *Macomber* and *Glenshaw Glass* themselves foreclose the Moores' arguments. In *Macomber*, the Court was clear that it was only providing a definition of what "[i]ncome may be defined as," 252 U.S. at 207, not a universal definition. *Glenshaw Glass* reiterated the limited scope of *Macomber*'s definition of income by emphasizing that, while the definition "served a useful purpose . . . , it was not meant to provide a touchstone to all future gross income questions." 348 U.S. at 431. *Glenshaw Glass* similarly cabined the definition of income it used, prefacing its definition of income by saying "[h]ere we have instances of," signaling that the Court was focused on the specific facts before it. *See id.* The Court in *Glenshaw Glass* never stated or suggested that the definition it used was a universal (or even broadly applicable) test. Realization was also not even

disputed in *Glenshaw Glass*, explaining why the Court did not make more than a passing reference to realization. *See id.* at 428–29 (discussing how both taxpayers had realized damages and simply disputed their need to pay taxes on them).

Second, the Supreme Court has subsequently made clear that *Macomber* and *Glenshaw Glass* do not provide a universal definition of income. In *Horst*, the Supreme Court explained that the concept of realization is "founded on administrative convenience" and does not mean that a taxpayer can "escape taxation because he did not actually receive the money." 311 U.S. at 116. In *Griffiths*, the Supreme Court explicitly stated that this holding from *Horst* "undermined . . . the original theoretical bases of the decision in *Eisner v. Macomber*." 318 U.S. at 394. The Supreme Court recently reiterated *Horst*'s statement that "the concept of realization is founded on administrative convenience," *Cottage Savings*, 499 U.S. at 559 (quoting *Horst*, 311 U.S. at 116), without adopting the test from *Glenshaw Glass* that the Moores urge upon us; in fact, the Court did not even cite to *Glenshaw Glass*.

Third, we have not adopted the definition of income the Moores advocate. In *James*, we cited a passage from *Glenshaw Glass* that included the definition of income the Moores favor, but we never adopted it then or later. *See* 333 F.2d at 752 (noting also that "insofar as [*Macomber*] purported to offer a comprehensive definition of the term income as used in the Sixteenth Amendment, it has been discarded."). Instead, we stated that there was no set definition of income under the Sixteenth Amendment. *See id.* at 752–53. Similarly, in *Comm'r v. Fender Sales, Inc.*, we did not cite to *Glenshaw Glass* or adopt the Moores' preferred definition when determining whether a tax was

constitutional under the Sixteenth Amendment. *See* 338 F.2d 924, 927 (9th Cir. 1964) (noting also that "[i]n this context, *Eisner v. Macomber* . . . is not even apposite, let alone controlling.").

Finally, although it does not control our analysis, holding that Subpart F is unconstitutional under the Apportionment Clause would also call into question the constitutionality of many other tax provisions that have long been on the books. *See* Bruce Ackerman, *Taxation and the Constitution*, 99 Colum. L. Rev. 1, 52 (1999). We decline to do so today.

## II. The MRT does not violate the Fifth Amendment's Due Process Clause

Retroactive legislation may violate the Fifth Amendment's Due Process Clause. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994). "[T]he presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic." *Id.* at 265. We assume, without deciding, that the MRT is retroactive.

While there is a presumption against retroactive laws, retroactive tax legislation is often constitutional. *See, e.g., United States v. Carlton*, 512 U.S. 26, 30 (1994) ("[The Supreme Court] repeatedly has upheld retroactive tax legislation against a due process challenge."); *United States v. Hemme*, 476 U.S. 558, 568 (1986) ("[The Supreme Court] has . . . made clear that some retrospective effect is not necessarily fatal to a revenue law."). To analyze a due process challenge to retroactive tax legislation, we use the "deferential" standard of "whether [the] retroactive application itself serves a legitimate purpose by rational means." *Quarty v. United States*, 170 F.3d 961, 965 (9th Cir. 1999) (citing *Carlton*, 512 U.S. at 30–31).

The MRT passes muster under *Carlton*.  The TCJA was a significant change in the U.S. tax code, shifting from a worldwide toward a territorial tax system, at least in part because of companies offshoring roughly $2.6 trillion in profits.    The MRT eliminated other taxes on CFCs' undistributed earnings before 2018.  So, if the MRT did not tax the undistributed earnings, shareholders would have been able to avoid taxation indefinitely on pre-2018 earnings.  The MRT, then, serves a legitimate purpose: it prevents CFC shareholders who had not yet received distributions from obtaining a windfall by never having to pay taxes on their offshore earnings that have not yet been distributed.

The MRT accomplishes this legitimate purpose by rational means.    The MRT accelerates the effective repatriation date of undistributed CFC earnings to a date following passage of the TCJA.  Having a single date of repatriation is a rational administrative solution.  The 30-year repatriation period also coincided with additional IRS reporting requirements, simplifying the calculation of taxes by both taxpayers and the IRS.[2]

The Moores' counterarguments are unpersuasive. Although the Moores may have expected their tax to remain deferred, their "reliance alone is insufficient to establish a constitutional violation.  Tax legislation is not a promise, and a taxpayer has no vested right in the Internal Revenue Code." *Carlton*, 512 U.S. at 33.    Further, while the MRT's retroactive period is long, it does not decide the analysis.

---

[2] The MRT also provided a lower tax rate than many shareholders would likely have paid otherwise: the MRT taxes CFC earnings at either 8% or 15.5%.    And, taxpayers may also elect to pay the MRT in installments over an eight-year period.  *See* Section 965 Transition Tax, The Internal Revenue Service, https://www.irs.gov/businesses/section-965-transition-tax (last visited May 30, 2022).

The Moores cannot cite a bright-line rule regarding how long ago a retroactive tax can apply because courts deferentially review tax legislation's purpose on a case-by-case basis. *See Quarty*, 170 F.3d at 965. Moreover, courts that have considered the retroactive nature of tax legislation often only view the period of retroactivity as one, non-dispositive consideration. *See, e.g.*, *GPX Int'l Tire Corp. v. United States*, 780 F.3d 1136, 1142 (Fed. Cir. 2015) (discussing five "considerations," of which retroactivity was only one).

Nor is the MRT a "wholly new tax," a label applied to unconstitutionally retroactive taxes by early cases "under an approach that has long since been discarded." *Quarty*, 170 F.3d at 966 (quoting *Carlton*, 512 U.S. at 34). We have very narrowly interpreted what qualifies as a "wholly new tax," determining that a "a new tax is imposed only when the taxpayer has 'no reason to suppose that any transactions of the sort will be taxed at all.'" *See Quarty*, 170 F.3d at 967 (quoting *United States v. Darusmont*, 449 U.S. 292, 298 (1981)). The MRT is not a "wholly new tax" because prior to the MRT, U.S. shareholders were taxed on CFC earnings when they were distributed. The Moores had reason to expect that such transactions would eventually be taxed. *See id*. This is especially true because as 11% shareholders of KisanKraft, the Moores were already subject to certain pre-MRT taxes that applied to shareholders who owned at least 10% of a CFC regardless of whether earnings were distributed. *See* 26 U.S.C. § 951(a)(1) (2007).

## CONCLUSION

For the above reasons, we **AFFIRM** the district court's grant of the Government's motion to dismiss and denial of the Moores' cross-motion for summary judgment.